## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| **COLOR SPOT HOLDINGS, INC., et al.,**[1] | Case No. 18-11272 (___) |
| Debtors. | (Joint Administration Requested) |

## DECLARATION OF PAUL W. RUSSO IN SUPPORT OF
## CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

I, Paul W. Russo, hereby declare under penalty of perjury, pursuant to section 1746 of title 28 of the United States Code, as follows:

1.      I am the Chief Executive Officer of each of the above-captioned debtors and debtors in possession (each, a "**Debtor**" and collectively, the "**Debtors**").

2.      On the date hereof (the "**Petition Date**"), each of the Debtors filed a voluntary petition for relief (the "**Petitions**") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "**Bankruptcy Code**") with the United States Bankruptcy Court for the District of Delaware (the "**Court**").  The Debtors continue to operate their business and manage their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  Concurrently herewith, the Debtors have filed a motion seeking joint administration of these chapter 11 cases (the "**Chapter 11 Cases**") pursuant to Bankruptcy Rule 1015(b).

3.      I submit this declaration (this "**First Day Declaration**"), pursuant to Rule 1007 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), to provide an overview of the Debtors' business and the Chapter 11 Cases and to support the Petitions and the Debtors' applications and motions for "first day" relief (collectively, the "**First Day Pleadings**").

---

[1]      The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are: Color Spot Holdings, Inc. (7061); Color Spot Nurseries, Inc. (3266); Hines Growers, Inc. (5946); and Lone Star Growers, Inc. (4748).  The Debtors' principal offices are located at 27368 Via Industria, Suite 201, Temecula, CA 92590.

4.      Except as otherwise indicated herein, all facts set forth in this First Day Declaration are based upon my personal knowledge of the Debtors' operations and finances, information learned from my review of relevant documents, information supplied to me by other members of the Debtors' management and the Debtors' professional advisors, or my opinion based on my experience, knowledge, and information concerning the Debtors' operations and financial condition.  To the extent that any information provided herein is materially inaccurate, we will act promptly to notify the Court and other parties; however, I believe all information herein to be true to the best of my knowledge.   I am authorized to submit this First Day Declaration on behalf of the Debtors and if called upon to testify, I could and would testify competently to the facts set forth herein.

I.      **THE DEBTORS' BUSINESS**

5.      Founded in 1983, the Debtors have become a leading grower and distributor of quality live plants in the western and southwestern United States.[2]  The Debtors operate 9 large-scale nurseries—6 in California, 2 in Texas, and 1 in Oregon—that comprise over 83 million square feet of outdoor growing space, over 11 million square feet of greenhouse space, and over 6 million square feet of shadehouse space.  The Debtors have about 1,600 year-round, full-time employees (over 1,300 of which are involved in production), which is augmented by another 610 seasonal employees, and a small number of year-round, part-time employees and independent contractors.   The Debtors' products include bedding plants, such as annuals, perennials and poinsettias and other holiday plants, which make up over 70% of revenues, and flowering and ornamental shrubs, which make up almost 30% of revenues.  In 2016 and 2017, the Debtors had sales of about $268 million and $248 million, respectively.  The Debtors' industry is expanding

---

[2]      A chart depicting the Debtors' organizational structure as of the Petition Date is attached hereto as <u>Exhibit A</u>.

due to, among other things, an ongoing focus by consumers on caring for their yards and outdoor spaces, favorable demographic shifts, and increasing housing stock. The Debtors are poised to capture upside from this industry growth.

6.      The Debtors are well-situated in the markets in which they operate, and they generally enjoy the first or second position in each market that they serve. The Debtors' customers include home improvement retailers, such as The Home Depot and Lowe's, general merchandisers, such as Costco, Target and Walmart, supermarkets and pharmacies, and smaller independent garden centers and nurseries. The Debtors count 9 of the 10 largest U.S. retailers as their customers, and the Debtors enjoy great longevity with their customers—having an average of 33 years of experience serving their top 5 customers.

7.      The Debtors' operations are divided into 4 divisions. The Color Spot West division distributes bedding products from four California-based nurseries, and its distribution ranges north to Oregon and Idaho, and as far as east as Colorado and New Mexico. The Hines Growers division distributes shrubbery from two California-based nurseries and an Oregon-based nursery, and its distribution covers California, Oregon, Washington and six other states east of them. The Color Spot Southwest division distributes both bedding products and shrubbery from two Texas-based nurseries, and its distribution includes the states immediately east and west of Texas plus Mississippi. These divisions are serviced by a fleet of trucks and trailers owned or leased by the Debtors and operated by up to 150 drivers at any time. About 75% of the Debtors' product distribution is handled by its internal fleet, providing the Debtors with a key competitive advantage as they can more efficiently manage logistics costs and can rapidly respond to customer delivery needs.

8.     The Debtors' fourth division provides merchandising services on customer premises.  In addition to growing their own plants, the Debtors have an approximately 375-person team that maintains an on-site presence at their customers' retail locations.  The employees in the merchandising division ensure that the quality of the Debtors' products is maintained and preserved from the time they arrive at retail locations to the time consumers purchase the products.  The merchandising team also complements and provides support to their customers' workforce with their on-location presence.  The responsibilities of the personnel in the merchandising team include arranging, receiving and unloading deliveries, maintaining floor space and positioning, caring for plants while they await sale, promotional and marketing initiatives, and communicating with the nursery divisions to ensure appropriate inventory at each retail location.  The merchandising team also provides services to other vendors whose products are adjacent to those of the Debtors in retail locations, thereby providing additional revenue opportunities for the Debtors.

9.     The Debtors' business experiences a high level of seasonality.  The high season for sales of bedding plants occurs in the spring and early summer.  This typically requires increased expenditures in the early part of the year as the Debtors grow products to be sold in the spring-summer period, and the Debtors see higher collections in the spring and summer as this inventory is sold off and the proceeds collected.  Historically, the Debtors' revolving credit facility balance reaches its high point in early spring as a result of this seasonality.  A similar seasonality manifests in connection with the Christmas season, when the Debtors focus on the cultivation of poinsettias.  Poinsettia production typically begins in the late summer to be ready for the Christmas season.  Given the lead times associated with production and the resources that need to be committed to it, the Debtors work with their larger customers to negotiate for

particular regions that the Debtors will service, and agree on targets for plant mix and volumes well in advance of the start of the growing season to ensure that the customers' projected needs can be fulfilled.

## II.    THE DEBTORS' CAPITAL STRUCTURE

10.    The Debtors have approximately $117.5 million in debt across three funded debt facilities, a subordinated promissory note related to a stock redemption in the approximate amount of $2.65 million (excluding accrued interest), approximately $20.7 million in unsecured trade debt and approximately $7 million in capital lease obligations.

### i.    *Wells Credit Documents*

11.    Debtors Color Spot Nurseries, Inc. and Hines Growers, Inc. (together, the "**Borrower Debtors**") are parties with Wells Fargo Bank, National Association ("**Wells**") to that certain Ninth Amended and Restated Credit Agreement, dated as of May 25, 2017 (as amended from time to time prior to the Petition Date, the "**Wells 2017 Credit Agreement**" and, together with the other loan documents related thereto, the "**Wells 2017 Credit Documents**"). Debtors Color Spot Holdings, Inc. and Lone Star Growers, Inc. are guarantors as set forth in that certain Fifth Amended and Restated Master Guaranty dated as of May 3, 2013 in favor of Wells, which guarantees the Borrower Debtors' obligations under the Wells 2017 Credit Documents (the "**Guarantor Debtors**"). The Wells 2017 Credit Agreement had an initial maturity of April 30, 2018, but the maturity was extended to June 1, 2018.[3] The Wells 2017 Credit Documents initially provided for a line of credit in the maximum principal amount of $97.5 million, but such

---

[3]    Among other things, the April 30, 2018 amendment to the Wells 2017 Credit Agreement included a $500,000 extension fee that would be added to the outstanding amounts due under the Wells 2017 Credit Agreement as elected by Wells. This fee was fully earned as of that date, but this extension fee would be waived if certain milestones were met. As of the Petition Date, this extension fee had not been added to the outstanding borrowings.

amounts has been stepped-up and stepped-down, including based on the seasonality of the Debtors' business, and as of the Petition Date, the maximum availability is $83,000,000.

12.     The Wells 2017 Credit Agreement had an initial interest rate of LIBOR plus 8.25%, with LIBOR plus 6.25% paid in cash and 2.0% deferred; and from December 5, 2017 to December 31, 2017, the interest rate was increased from 8.25% to 12.25%, with the cash paid portion remaining at LIBOR plus 6.25% but the deferred portion increasing to 6.0%.  In addition, beginning on December 5, 2017, the parties amended the Wells 2017 Credit Agreement a number of times to provide for an over-advance facility, which was initially $2.7 million, increased to $12 million at December 31, 2017, and stayed at approximately that level until March 17, 2018, when it began to decrease.  As of the Petition Date, the overadvance amount is $1.2 million.  The amendments to the Wells 2017 Credit Agreement that took place from and after December 5, 2017, also included a number of milestones with respect to the Debtors' efforts to refinance the amounts owed to Wells, sell portions or all of the Debtors' business, or ultimately engage in a liquidation of the Debtors assets without Court supervision.

13.     The Borrower Debtors are also parties with Wells to that certain Credit Agreement, dated as of February 12, 2018 (as amended from time to time prior to the Petition Date, the "**Wells 2018 Credit Agreement**" and, together with the other loan documents related thereto, the "**Wells 2018 Credit Documents**") to provide the Debtors with temporary bridge financing.  The Guarantor Debtors also guarantied the obligations under the Wells 2018 Credit Documents. The Wells 2018 Credit Documents provided for a revolving line of credit, which was evidenced by a Revolving Line of Credit Note (the "**2018 Revolver Note**") in the initial maximum principal amount of $2,774,212 with an initial maturity of April 30, 2018.  Through a series of amendments, the maximum principal amount of the 2018 Revolver Note was modified

from time to time, and the last amendment, on April 20, 2018, was to increase the note maximum balance to $5,000,000. Also, on April 30, 2018, the maturity of the 2018 Revolver Note was extended to May 4, 2018. The 2018 Revolver Note was subject to cash-paid interest at a rate of LIBOR plus 12.25%. The 2018 Revolver Note (including all interest accrued thereon) was paid in full on May 4, 2018, in the amount of $1,002,000. The Wells 2018 Credit Agreement additionally included a Term Note in the principal amount of $300,000 (the "**2018 Fee Note**"), which was on account of a deferred commitment fee and has a maturity of June 1, 2018. As of the Petition Date, the obligations under the 2018 Fee Note remain outstanding.[4]

14.     As of May 29, 2018, Wells asserts that the Borrower Debtors were jointly and severally indebted and liable under the Wells 2017 Credit Documents and Wells 2018 Credit Documents (collectively, the "**Wells Credit Documents**") in an aggregate amount of approximately $83,400,000 (collectively, the "**Wells Obligations**").

15.     Wells asserts that the Borrower Debtors' obligations under the Wells 2017 Credit Agreement and Wells 2018 Credit Agreement are (or were) secured under that certain Security Agreement dated as of May 3, 2013 (as amended from time to time prior to the Petition Date, the "**Wells Borrower Security Agreement**"), and the obligations of Color Spot Holdings, Inc. and Lone Star Growers, Inc. as guarantors are secured under that certain Master Guarantor Security Agreement dated as of May 3, 2013 (as amended from time to time prior to the Petition Date, the "**Wells Guarantor Security Agreement**"). Pursuant to the Wells Borrower Security Agreement and Wells Guarantor Security Agreement, among other things, Wells asserts that each Borrower Debtor granted liens upon and security interests in the "Collateral," as defined in the Wells

---

[4]     The amounts due under the 2018 Fee Note would be waived if, at certain points, all outstanding obligations owed to Wells had been satisfied or cash collateralized, and the Debtors were not subject to insolvency proceedings. Neither of those conditions were met prior to the Petition Date.

Borrower Security Agreement, and the Guarantor Debtors granted liens upon and security interests in the "Guarantor Collateral," as defined in the Wells Guarantor Security Agreement (such collateral is collectively referred to herein as the ("**Wells Collateral**").  The Debtors have also granted to Wells certain fee mortgages and leasehold mortgages (and the subject fee simple interests and leasehold interest are intended to be included in the term "Wells Collateral" as defined herein).  The Wells Collateral purports to encompass substantially all of the Debtors' assets.

### ii.    *CFC Credit Documents*

16.    The Borrower Debtors are parties with Capital Farm Credit, FLCA ("**CFC**") to that certain Loan Agreement, dated as of December 23, 2014 (as amended from time to time prior to the Petition Date, the "**CFC Loan Agreement**" and, together with the other loan documents related thereto, the "**CFC Loan Documents**").  The CFC Credit Documents provide for a loan in the aggregate principal amount of $28,700,000 (which includes an initial loan in the amount of $25,000,000 (the "**Initial CFC Loan**"), plus an additional loan agreed to through an October 18, 2016 amendment to the CFC Loan Agreement in the aggregate principal amount of $3,700,000 (the "**Additional CFC Loan**")).  The Initial CFC Loan bears interest at the rate of one-month LIBOR plus 3.50% (payable quarterly) and is subject to full amortization over a ten year period beginning July 1, 2015, while the Additional CFC Loan bears interest at the rate of one-month LIBOR plus 3.75% (payable quarterly) and is subject to full amortization over a ten year period beginning January 1, 2017.  Amortization payments are payable in 30 tri-annual payments on July 1, October 1 and January 1 of each year.

17.    As of the Petition Date, CFC asserts that the Borrower Debtors were indebted and liable to CFC under the CFC Credit Documents in an aggregate amount of approximately

$20,466,000, plus accrued interest and fees (collectively, the "**CFC Obligations**").    The Guarantor Debtors also guarantied the CFC Obligations.

18.    CFC asserts that the Borrower Debtors' obligations under the CFC Loan Agreement are secured under that certain Security Agreement dated as of December 23, 2014 (as amended from time to time prior to the Petition Date, the "**CFC Borrower Security Agreement**").    Pursuant to the CFC Security Agreement, among other things, CFC asserts that each Borrower Debtor granted liens upon and security interests in the "Collateral," as defined in the CFC Security Agreement (the "**CFC Collateral**").

### iii.    BD Credit Documents

19.    Debtor Color Spot Nurseries, Inc. is party with Black Diamond Commercial Finance, L.L.C. ("**BD**") to that certain Third Lien Term Loan Agreement, dated as of December 23, 2014 (as amended from time to time prior to the Petition Date, the "**BD Loan Agreement**"[5] and, together with the other loan documents related thereto, the "**BD Loan Documents**").[6] Debtors Color Spot Holdings, Inc., Hines Growers, Inc., and Lone Star Growers, Inc. are guarantors as set forth in that certain Guaranty Agreement, dated as of December 23, 2014, in favor of BD, which guarantees Color Spot Nurseries, Inc.'s obligations under the BD Loan Documents.    The BD Credit Documents provide for a loan in the aggregate principal amount of $10,000,000.    The BD Loan Agreement bears interest at a rate of 14.5% per annum, which is paid in kind and added to the loan balance, and has a maturity of March 31, 2019.

---

[5]    Collectively, the Wells 2017 Credit Agreement, the Wells 2018 Credit Agreement, the CFC Loan Agreement and the BD Loan Agreement shall be defined herein as the "**Secured Credit Agreements**."

[6]    Collectively, the Wells 2017 Credit Documents, the Wells 2018 Credit Documents, the CFC Loan Documents and the BD Loan Documents shall be defined herein as the "**Secured Credit Documents**."

20.    As of the Petition Date, BD asserts that Color Spot Nurseries, Inc. was indebted and liable to BD under the BD Credit Documents in an aggregate amount of approximately $14,881,000, plus accrued interest and fees (collectively, the "**BD Obligations**").[7]

21.    BD asserts that Color Spot Nurseries, Inc.'s obligations under the BD Loan Agreement are secured under that certain Security Agreement dated as of December 23, 2014 (as amended from time to time prior to the Petition Date, the "**BD Borrower Security Agreement**") and the obligations of Color Spot Holdings, Inc., Hines Growers, Inc., and Lone Star Growers, Inc. as guarantors are secured under that certain Third Lien Security Agreement dated as of December 23, 2014 (as amended from time to time prior to the Petition Date, the "**BD Guarantor Security Agreement**").    BD asserts that, pursuant to the BD Borrower Security Agreement, among other things, Color Spot Nurseries, Inc. granted liens upon and security interests in the "Collateral," as defined in the BD Security Agreement.    BD asserts that, pursuant to the BD Guarantor Security Agreement, Color Spot Holdings, Inc., Hines Growers, Inc., and Lone Star Growers, Inc. granted liens upon and security interests in the "Collateral," as defined in the BD Guarantor Security Agreement (the "**BD Collateral**").[8]

### iv.    Intercreditor Agreement

22.    Wells, CFC, and BD (collectively, the "**Prepetition Secured Parties**"), along with the Borrower Debtors, are parties to that certain Intercreditor Agreement, dated as of December 23, 2014 (as amended from time to time prior to the Petition Date, the "**Intercreditor Agreement**").    The Intercreditor Agreement purportedly, among other things:

---

[7]    Collectively, the Wells Obligations, the CFC Obligations and the BD Obligations shall be defined herein as the "**Secured Prepetition Obligations**."

[8]    Collectively, the Wells Collateral, the CFC Collateral and the BD Collateral shall be defined herein as the "**Prepetition Collateral**."

(a)    confirmed the senior priority of the security interests of Wells in the **personal property** collateral described on Schedule 1 to the Intercreditor Agreement over the second priority security interests of CFC as to that property, and over the third priority security interests of BD as to that property;

(b)    confirmed the senior priority of the security interests of CFC in the **real property collateral**  described on Schedule 2 to the Intercreditor Agreement over the second priority security interests of Wells as to that property, and over the third priority security interests of BD as to that property;

(c)    confirmed the senior priority of the security interests of Wells in the **real property collateral (related to the Debtors' leasehold interests in property)** described on Schedule 3 to the Intercreditor Agreement over the second priority security interests of BD as to that property;

(d)    provides for the senior right of repayment of the senior secured party with respect to any particular category of collateral prior to any repayment of the junior secured party as to that category of collateral;

(e)    provides for the waiver by the junior secured party(ies) of any rights to (i) direct the senior secured party for any common collateral to exercise any right, remedy or power with respect to that common collateral or (ii) consent or object to the exercise by the senior secured party of any right, remedy or power with respect to common collateral or to the timing or manner in which any such right is exercised or not exercised; and

(f)    provides certain other rights and obligations by and among the Prepetition Secured Parties relating to the relevant collateral, their respective enforcement rights in and access to the relevant collateral, and the application of proceeds of common collateral.

### v.    *Unsecured Note*

23.    Debtor Color Spot Nurseries, Inc. is party with Karla D. Vukelich, Sole Surviving Co-Trustee of the Michael F. and Karla D. Vukelich Trust (the "**Unsecured Note Trustee**"), to that certain Subordinated Promissory Note, dated October 14, 2011 (the "**Unsecured Note**"). The counterparty to the Unsecured Note holds no security interest with respect to the unpaid obligations thereunder.  The Unsecured Note Trustee asserts that as of the Petition Date, Color Spot Nurseries, Inc. was indebted and liable to the Unsecured Note Trustee in an aggregate amount of approximately $2,655,000, plus accrued interest.

### vi.     *Other Debt*

24.     As of the Petition Date, the Debtors' books and records list approximately $20.7 million in outstanding trade liabilities.  The Debtors estimate that the aggregate amount of outstanding capital lease-related expenses is approximately $7 million.

## III.   EVENTS LEADINGS TO CHAPTER 11

25.     The Debtors have suffered from declining market share and revenues since 2014, which has been the result of various contributing factors.  First, a substantial part of the Debtors' nurseries are located in California, and California suffered a six-year drought that only ended in the spring of 2017.  That drought resulted in substantial water restrictions from 2014 through 2017 that impacted the Debtors' operations.  Second, Texas, where most of the Debtors' remaining nurseries are located, experienced adverse weather events in 2015 and 2017, which negatively impacted the Debtors' performance there.  Third, the Debtors' focus on customer service waned as the Debtors grew in size, which translated into losses of certain markets with key customers.

26.     I was appointed Chief Executive Officer of the Debtors in March of 2017, and I believe a number of factors led to the board's decision to appoint me.  I had previously served as a director of the Debtors for 7 years and spent 6 months as Chief Operating Officer of the Debtors in 2014 so I was familiar with the Debtors' business.  My previous appointment to the board was brought about by my experience leading and improving performance of private equity owned companies, my experience as an officer of The Stanley Works (NYSE: SWK), a Fortune 500 manufacturer of industrial tools, household hardware, locks, and security services) where I gained a good understanding of the home center and mass market retailers, and my background as a former Partner of Bain and Company (leading strategy consultancy).  My additional qualifications include an MBA from Harvard, a BS in business from the University of California,

and former certification as a CPA in California. When the Debtors developed financial challenges and the Debtors remaining, surviving co-founder sought retirement, the Board recruited me to lead the company through the Debtors' leadership transition and to address the company's current financial challenges.

27.     Prior to my appointment, I spent several weeks as a consultant to the Debtors to understand the challenges facing the Debtors' business and develop the initial priorities to address if I were to be appointed as CEO.  The most urgent was that the existing revolving credit facility had matured on January 31, 2017 and while the Debtors were operating pursuant to interim financing from Wells Fargo, the Debtors had no plans underway to refinance the Debtors' indebtedness.  The next most immediate priorities included right-sizing the Debtors' cost structure to their revenues and addressing the customer dissatisfaction that was contributing to the sales decline.   I also was able to assess the Debtors' management team and concluded that one of the Debtors' key advantages was a core management team that was highly competent and deeply passionate about the Debtors' business.

28.     Once appointed, I began an operational restructuring and turn-around of the business that included:

- Negotiating an amendment and restatement of the existing revolving credit facility with Wells Fargo, including an extended maturity of April 30, 2018;

- Soliciting customer support by meeting with the leadership of key customer to identify and address problem areas;

- Right-sizing production capacity to match revenues, including closing 4 of 13 nurseries in the first 9 months of my tenure;

- Simplifying the product mix to improve production efficiency and increasing inventory investment in best sellers, eliminating production of  40% of the genera grown which were contributing less than 10% of sales; and

- Eliminating layers of management to improve responsiveness, which, along with facility closures, generated a 30% reduction in employee headcount in nine months.

Overall, these initiatives resulted in about $10 million in savings, and the Debtors believe that they have positioned the business for growth and increased profitability.

29.     In May of 2017, Wells agreed to amend and restate the then-in-place revolving credit facility to provide the Debtors with an additional 11 months (*i.e.*, until April 30 2018) of borrowing availability (this became the Wells 2017 Credit Agreement described above).  The intent of this amendment was to allow the Debtors time to implement their turnaround strategy and explore a potential sale transaction or refinancing.  In late 2017 and continuing into early 2018, the Debtors engaged in negotiations with an interested party to acquire the Color Spot Southwest division, but the potential purchaser was ultimately unable to consummate a transaction.  The Debtors also engaged a financial advisor to assist them in exploring a potential refinancing of the Wells 2017 Credit Agreement, but at the request of Wells Fargo, the Debtors agreed to explore a possible sale of the whole company.  The Debtors engaged Raymond James & Associates ("**Raymond James**"), effective as of February 1, 2018, to conduct a marketing process for their assets.

30.     In late April 2018, Raymond James began contacting parties to determine if they may be interested in an acquisition of the Debtors' business.  In total, Raymond James contacted 80 parties, comprised of strategic and financial parties, and distributed a "teaser."  Thirty-seven (37) parties executed a non-disclosure agreement and received a "confidential information memorandum" describing the Debtors' business and the potential investment opportunity.  Given

the milestones under an April 30 amendment to the Wells 2017 Credit Agreement,[9] Raymond James communicated to all parties that they should submit indications of interest for a transaction with the Debtors by May 23, 2018.  By that date, Raymond James received two indications of interest for the Debtors' entire business as a going concern and a third offer for one of the Debtors' three production divisions.  I have been advised that a number of additional parties continue to express interest in an acquisition with the Debtors even though they did not provide Raymond James with an indication of interest by May 23, 2018.

## IV.    THE DEBTORS' GOAL IN THESE CHAPTER 11 CASES

31.    The Debtors are now faced with a maturity under the Wells 2017 Credit Agreement that is only days away, and about $83 million of funded debt will be due.  The Debtors also owe additional funded debt of more than $35 million to BDCF and CFC, and the Debtors have at least $28 million in capital lease obligations, trade payables and other general unsecured claims.  The Debtors believe that they have a viable business, but their current capital structure is unsustainable—particularly with $83 million due to Wells on June 1.  Based on the preliminary indications of interest that the Debtors have received, it is possible that a sale transaction may not generate sufficient proceeds to cover the full amount of the Debtors' current debt.

32.    To address these issues, the Debtors intend to sell their business as a going concern under section 363 of the Bankruptcy Code, including free and clear of liens, claims, and encumbrances under subsection (f).  The Debtors firmly believe that selling their businesses as a going concern, including with the protections afforded under section 363(f) of the Bankruptcy

---

[9]    Starting at the end of 2017, the Wells 2017 Credit Agreement was amended a number of times to include and revise milestones with respect to a potential sale process and, for a time, a refinancing.  On April 30, 2018, the Wells 2017 Credit Agreement was last amended, including to extend the maturity date to June 1, 2018 and implement milestones whereby the Debtors were required to obtain bids for a sale transaction and deliver such bids to Wells not later than 6:00 p.m. on May 25, 2018.

Code, will yield the highest recovery to their estates.  The alternatives to a going-concern sale that are available to the Debtors at this time would produce a sub-optimal outcome.  The Debtors will be requesting that the Court establish the following timeline for their proposed sale process:

| | |
|---|---|
| Bid Procedures Hearing: | Monday, June 25, 2018 |
| Bids Due/ Objection Deadline: | Monday, July 16, 2018 |
| Auction: | Monday, July 18, 2018 |
| Sale Hearing: | Monday, July 23, 2018 |
| Anticipated Closing: | Tuesday, July 31, 2018 |

33.    The Debtors need to act quickly to close a sale for several reasons.  First, the summer season follows the Debtors' peak spring sales season and leads to declines in sales and collections; therefore, it will become more difficult for the Debtors to operate the business solely based on the cash generated  through operations as they move from the profitable spring season into the later parts of the summer.  Second, August into September begins a capital-intensive period for the Debtors because that is when they will begin to ramp up production for their holiday plant season.  A new owner of the Debtors' business with fresh capital will be able to meet those needs and ensure the continuation of the Color Spot business.  Absent additional committed capital, it may be difficult for the Debtors to meet those needs.  Third, also by August, the Debtors' customers will have begun planning and sourcing product for the 2019 spring season.  It is imperative that the sale process not only be well underway, but coming to a conclusion by that time.  A sale on the timeline the Debtors are proposing will provide the assurances customers will expect when placing their orders with Color Spot in that period.

34.    The Debtors have reviewed their expected cash receipts and cash needs over the 13-week period from and after the Petition Date, and the Debtors believe that they can operate

their business solely from the use of cash generated in that period from the sale of products and

the collection of accounts receivable.   The Debtors have prepared a budget for that 13-week

period (the "**Budget**") that includes amounts necessary to meet the administrative expenses that

will be incurred while the Debtors pursue a sale transaction, as well as payments on account of

certain prepetition claims that the Debtors believe will be essential and necessary to preserve the

going concern value of the Debtors, as described in detail in the First Day Pleadings.  Based on

my review of the Budget and my discussions with the Debtors' other personnel, I believe that the

expenditures set forth in the Budget include all those amounts that will be necessary to ensure

that there is no diminution or diminishment in the going-concern value of the Debtors' assets.

Therefore, I believe that the expenditure of these amounts is necessary to protect the Debtors,

their estates, and their creditors, including their alleged secured creditor.  If the going-concern

value of the Debtors' business is impaired or if the Debtors are not able to continue operations as

a going concern and are forced to pursue alternatives because the Debtors do not have access to

fund the amounts in the Budget, I believe that amounts realized from the Debtors' assets would

be substantially diminished.   On this basis, I believe that the use of the Debtors' cash will

preserve (if not enhance) the assets that the Debtors' secured lenders claim as their collateral.

   35. Cash-on-hand and the proceeds of inventory and receivables represent

substantially all, if not the entirety, of the assets from which the Debtors will generate cash

during the period covered by the Budget.    I believe that Wells, BD and CFC assert liens against

the cash in the Debtors' bank accounts as of the Petition Date, as well as the Debtors' inventories

and receivables and their proceeds.  The Debtors have an immediate need to access this cash to

fund the amounts in the Budget.  As noted above, if the Debtors do not have immediate access to

fund the items set forth in the Budget, then the value of the Debtors' assets may be impaired, and maybe substantially, resulting in immediate and irreparable harm.

## V.    FIRST DAY PLEADINGS

36.    To facilitate the Chapter 11 Cases, the Debtors filed the First Day Pleadings seeking various forms of relief.  Generally, the First Day Pleadings have been designed to meet the Debtors' goals of:  (i) continuing their operations in chapter 11 with as little disruption and loss of productivity as possible while the Debtors seek to maximize the value of their estates through the Chapter 11 Cases; (ii) maintaining the confidence and support of their employees and other key constituents during the chapter 11 process; and (iii) establishing procedures for the smooth and efficient administration of the Chapter 11 Cases.

37.    A list of the First Day Pleadings is set forth below:

(1)    *Debtors' Motion for an Order, Pursuant to Bankruptcy Rule 1015 and Local Rule 1015-1, Authorizing the Joint Administration of the Debtors' Chapter 11 Cases*;

(2)    *Debtors' Application for Entry of an Order Appointing Epiq Bankruptcy Solutions, LLC as Claims Agent Effective as of the Petition Date*;

(3)    *Debtors' Motion for Interim and Final Orders Pursuant to Section 366 of the Bankruptcy Code (I) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Utility Services, (II) Deeming Utility Companies Adequately Assured of Future Performance, (III) Establishing Procedures for Determining Additional Adequate Assurance of Payment, and (IV) Setting a Final Hearing Related Hereto*;

(4)    *Debtors' Motion for Order (I) Authorizing Payment of Certain Prepetition Taxes and (II) Authorizing Financial Institutions to Honor and Process All Related Checks and Electronic Payment Requests*;

(5)    *Debtors' Motion for an Order (I) Authorizing the Debtors to (A) Continue Prepetition Insurance Policies, (B) Pay all Prepetition Obligations in Respect Thereof, and (C) Continue*

18

*Insurance Premium Financing Program, and (II) Authorizing Banks to Honor and Process Related Checks and Transfers*;

(6) *Debtors' Motion for Entry of an Order Authorizing the Debtors to Honor Prepetition Customer Obligations*;

(7) *Debtors' Motion for an Order (I) Authorizing (A) Continued Use of the Debtors' Existing Cash Management System and Procedures, (B) Continuation of Intercompany Transactions, and (C) Maintenance and Use of Existing Bank Accounts and (II) Waiving the Requirements of Section 345(b) of the Bankruptcy Code on an Interim Basis*;

(8) *Debtors' Motion for an Order (I) Authorizing the Debtors to (A) Pay Prepetition Employee Obligations and (B) Maintain Employee Wages and Benefits Programs and Pay Related Obligations and (II) Authorizing the Banks to Honor and Process Related Checks and Electronic Transfers*;

(9) *Debtors' Motion for Entry of Interim and Final Orders Authorizing the Debtors to Continue Factoring their Receivables under Various Factoring Agreements and to Accelerate Receivables Consistent with Prepetition Practices*;

(10) *Debtors' Motion for Interim and Final Orders (I) Authorizing, but Not Directing, Payment of Prepetition Claims of Certain Critical Vendors and (II) Authorizing Banks To Honor and Process Related Checks and Transfers*;

(11) *Debtors' Motion for Interim and Final Orders (A) Authorizing Postpetition Use of Cash Collateral, (B) Granting Adequate Protection, (C) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001(b), and (D) Granting Related Relief*; and

(12) *Debtors' Emergency Motion for Entry of an Order Authorizing Limited Use of Cash Collateral and Payment of Certain Prepetition Employee Obligations*.

38.    I have reviewed each of the First Day Pleadings filed contemporaneously herewith, and the facts set forth in the First Day Pleadings are true and correct to the best of my knowledge, information, and belief, and are incorporated herein by reference.  It is my belief that the relief sought in each of the First Day Pleadings is tailored to meet the goals described above

and, ultimately, will enhance the Debtors' ability to maximize the value of their estates for the benefit of all of the Debtors' stakeholders.

39.     It is my belief that the relief sought in each of the First Day Pleadings is necessary for a successful sale process and to maximize creditor recoveries.  It is my further belief that, with respect to those First Day Pleadings requesting the authority to pay specific prepetition claims or continue selected prepetition programs—those First Day Pleadings seeking relief related to the Debtors' obligations to their employees, taxing authorities, vendors, service providers, banks, and insurers—the relief requested is essential to the Debtors' sale efforts and necessary to avoid immediate and irreparable harm to the Debtors' estates.  The success of the Chapter 11 Cases depends upon the Debtors' ability to maintain their operations and maximize estate value.  The relief requested in the First Day Pleadings is a critical component of maintaining uninterrupted business operations and the confidence of key constituencies necessary to implement a successful restructuring.

40.     I respectfully request that all of the relief requested in the First Day Pleadings, and such other and further relief as may be just and proper, be granted.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: Wilmington, Delaware
        May 29, 2018                          _/s/ Paul W. Russo_____
                                              Paul W. Russo
                                              Chief Executive Officer

**EXHIBIT A**

Corporate Organizational Chart

## Organizational Chart of Color Spot Holdings, Inc.

