# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| **COLOR SPOT HOLDINGS, INC., et al.,**[1] | Case No. 18-11272 (LSS) |
| Debtors. | (Jointly Administered) |
| | Hearing Date: June 25, 2018 at 10:00 a.m. (ET)<br>Obj. Deadline: June 18, 2018 at 4:00 p.m. (ET) |

**DEBTORS' MOTION FOR ENTRY OF (A) AN ORDER (I) SCHEDULING A HEARING ON THE APPROVAL OF THE SALE OF ALL OR SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL ENCUMBRANCES, AND THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, (II) APPROVING CERTAIN BIDDING PROCEDURES, ASSUMPTION AND ASSIGNMENT PROCEDURES, AND THE FORM AND MANNER OF NOTICE THEREOF, AND (III) GRANTING RELATED RELIEF; AND (B) AN ORDER (I) APPROVING ASSET PURCHASE AGREEMENT, (II) AUTHORIZING THE SALE OF ALL OR SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL ENCUMBRANCES, (III) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (IV) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "**Debtors**" or the "**Company**") hereby submit this motion (this "**Motion**"), pursuant to sections 105, 363, 365, 503 and 507 of title 11 of the United States Code (the "**Bankruptcy Code**"), for the entry of: (a) an order, substantially in the form attached hereto as <u>Exhibit A</u> (the "**Bidding Procedures Order**"), (i) scheduling a hearing (the "**Sale Hearing**") on approval of the sale of all or substantially all of the Debtors' assets (collectively, the "**Assets**"), or subsets thereof, free and clear of all liens, claims, encumbrances, and other interests (collectively, the "**Encumbrances**"), and authorizing the assumption and assignment of certain executory contracts and unexpired leases (each, a "**Target Contract**," and collectively, the "**Target Contracts**") in connection

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are: Color Spot Holdings, Inc. (7061); Color Spot Nurseries, Inc. (3266); Hines Growers, Inc. (5946); and Lone Star Growers, Inc. (4748).  The Debtors' principal offices are located at 27368 Via Industria, Suite 201, Temecula, CA 92590.

therewith; (ii) authorizing and approving certain bidding procedures for the sale (collectively, the "**Bidding Procedures**," a copy of which is attached as <u>Exhibit 1</u> to the Bidding Procedures Order),[2] certain procedures for the assumption and assignment of the Target Contracts (collectively, the "**Assumption and Assignment Procedures**"), and the form and manner of notice thereof; and (iii) granting related relief; and (b) an order (i) authorizing and approving the Debtors' entry into an asset purchase agreement or agreements for the Assets (each, a "**Purchase Agreement**");[3] (ii) authorizing and approving the sale of the Debtors' assets (the "**Sale**"),[4] free and clear of all Encumbrances other than those permitted by the subject Purchase Agreement; (iii) authorizing and approving the assumption and assignment of the Assumed Contacts in connection therewith; and (iv) granting related relief.  In support of this Motion, the Debtors respectfully state as follows:

## PRELIMINARY STATEMENT[5]

1.    The Debtors operate one of North America's leading commercial nurseries, producing and distributing broad assortments of ornamental shrubs, color plants, and container-grown plants.  With 9 nurseries in California, Oregon, and Texas, the Debtors represent a substantial amount of the commercial nursery capacity in the western United States and sell their high quality flowers and shrubs to more than 2,000 retail and commercial customers throughout the United States.  The Debtors count among their largest clients 9 of the 10 largest retailers in the United States, including The Home Depot, Lowe's and Wal-Mart.

---

[2]    Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Bidding Procedures.

[3]    A form Purchase Agreement and a proposed form of sale order will be made available to potential bidders in the confidential Data Room (as defined herein).

[4]    As used herein, a Sale includes the acquisition of the Debtors' business (or portions thereof) through a transaction implemented through a chapter 11 plan.

[5]    Additionally, capitalized terms used but not defined herein shall have the meanings ascribed to them in the First Day Declaration (as defined below).

2.      Recently, the Debtors implemented an operational and financial restructuring to respond to downward trends in their financial performance, which were brought about by the impacts of an historic six-year drought in California where a substantial portion of the Debtors' nurseries are located, excessive precipitation in Texas (the Debtors' next largest growing area) in recent years, and declines in customer satisfaction resulting from a loss of focus on customer-service initiatives.  The Debtors believe they have corrected or otherwise reversed the factors that have adversely affected their business and weighed on their financial performance and are now poised to succeed and grow within the markets they serve in the western part of the country. In fact, while the Debtors enjoy the number one or two position in the markets they serve, they believe that there remains room to grow by increasing their share of retail outlets serviced in the markets they operate in and by growing their presence and revenue generation opportunities within the stores they already service.  However, the Debtors are faced with the immediate maturity of approximately $83 million in indebtedness under their revolving credit facility and no ability to satisfy these obligations in the near term.

3.      The Debtors concluded that filing these chapter 11 cases and engaging in a sale of substantially all of the Debtors' assets is the best path forward as it will maximize the value of the Debtors' estate for the benefit of all creditors.  The Debtors believe that a recapitalization of their business through a going-concern sale transaction will result in the greatest return of value on their assets.  A sale of their assets under section 363(f) of the Bankruptcy Code through a market-tested process will provide an opportunity to de-lever the financial burdens on the Debtors' business imposed by their existing debt-load, a substantial amount of which is now at maturity.  The Debtors are filing this Motion to execute this objective.  While the Debtors believe that a going-concern sale of the entire enterprise will yield the optimal result providing

maximum value, the Debtors are offering their Assets for sale in any combination and in any form, including a possible restructuring of the Debtors.  Through the marketing and sales process described below, the Debtors seek to solicit interest in their Assets, on a broad scale and through all viable channels, in an effort to generate the highest and best return for creditors and estate constituents.

## JURISDICTION AND VENUE

4.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated as of February 29, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and the Court may enter a final order consistent with Article III of the United States Constitution.  Venue is proper in the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

5.      The statutory and legal predicates for the relief sought herein are sections 105, 363, 365, 503 and 507 of the Bankruptcy Code, Rules 2002, 6004 and 6006 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rules 2002-1 and 6004-1 of the Local Rules of Bankruptcy Practice and Procedure for the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**").

## BACKGROUND

6.      On May 29, 2018 (the "**Petition Date**"), each of the Debtors commenced a voluntary case under chapter 11 of the Bankruptcy Code.  The Debtors are authorized to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No official committees have been appointed in these chapter 11 cases and no request has been made for the appointment of a trustee or an examiner.

7.      Additional information regarding the Debtors' businesses, capital structure, and the circumstances leading to the filing of these chapter 11 cases is set forth in the *Declaration of*

*Paul W. Russo in Support of Debtors' Chapter 11 Petitions and First-Day Motions* (the "**First Day Declaration**").

## RELIEF REQUESTED

8.      By this Motion, the Debtors seek entry of: (a) the Bidding Procedures Order, (i) scheduling a date for the Sale Hearing, (ii) authorizing and approving the Bidding Procedures and the Assumption and Assignment Procedures, and the form and manner of notice thereof, and (iii) granting related relief; and (b) the Sale Order, (i) authorizing and approving the Debtors' entry into any Purchase Agreement with a Successful Bidder, (ii) authorizing and approving the Sale, free and clear of all Encumbrances, (iii) authorizing and approving the assumption and assignment of the Assumed Contacts to any Successful Bidder; and (iv) granting related relief.

9.      The auction process is for a sale of substantially all of the Assets, or components thereof, including but not limited to the Debtors' inventory, fee-owned real properties, leases of nonresidential real property, other personal property and intellectual property or any other transaction to restructure one or more of the Debtors and its or their business.  Any of the foregoing shall be referred to as a "**Transaction**," regardless of whether it takes the form of a sale or restructuring

10.      **All due diligence inquiries regarding the Assets should be directed to the Debtors' investment banking advisors, Raymond James & Associates, Inc. ("Raymond James") by contacting: Jay Eastman at 410-525-5176 and Jay.Eastman@RaymondJames.com, and Geoff Richards at 212-885-1885 and Geoffrey.Richards@RaymondJames.com.**

A.      **Sale Process**

11.      Prior to the Petition Date, the Debtors and their advisors explored restructuring alternatives, including the sale of all of the Debtors' operations.  In February 2018, the Debtors

5

retained Raymond James as their investment banking advisor to assist the Debtors in a potential sales process.

12.      Starting in April 2018, Raymond James ran a process to assess whether parties were interested in submitting indications of interest to acquire the Assets as a going concern. Raymond James pursued a broad marketing campaign on behalf of the Debtors, and they contacted 80 parties with a "teaser" to solicit interest in a potential transaction.  Thirty-seven of these parties signed confidentiality agreements, which gained them access to a confidential information memorandum that provided a comprehensive overview of the Debtors' business and the potential investment opportunity.  Consistent with the directions provided to the parties solicited in this process, on May 23, 2018, the Debtors received two indications of interest expressing interest in a transaction to acquire the Debtors' Assets as a going concern and a third indication of interest with respect to one of the Debtors' three operating divisions.  Raymond James has also been contacted by a number of other parties who have expressed an interest in performing further diligence on the Debtors and a potential transaction for the Assets.

13.      Now that the Debtors have commenced these chapter 11 cases, they will continue, through Raymond James, to engage with the market and potential purchasers, including those expressing interests in the pre-petition period, under the auspices of this Court and a Court-approved sale process.  The Debtors believe that the process proposed hereby is designed to generate maximum interest in the Assets by offering maximum flexibility with respect to Sale proposals.  The Debtors developed the Bidding Procedures in consultation with their professional advisors, and designed the Bidding Procedures to preserve flexibility in this marketing process and generate the greatest level of interest and the highest or best value for the Assets.

B.    **Stalking Horse Purchaser**

14.    By this Motion and in connection with the Bidding Procedures, the Debtors request authority, but not direction, to enter into an agreement (a "**Stalking Horse Agreement**") with an interested bidder to serve as the stalking horse bidder (the "**Stalking Horse Purchaser**") to acquire substantially all of the Assets on a going-concern basis.  A Stalking Horse Purchaser will aid the Debtors in its sale process by providing a baseline from which other interested parties may bid, will ensure continuity of the Debtors' business for the Debtors' customer, employee and vendor base, and will result in a firm commitment to consummate a Transaction and definite consideration on which the Debtors can begin to formulate a resolution of these chapter 11 cases.  The Debtors believe that a Stalking Horse Agreement would take the form of either a going-concern buyer interested in acquiring the Assets through a sale or an offer, memorialized in a reasonably-detailed and supported term sheet, from strategic or alternative investors interested in acquiring an equity stake in the Debtors.

15.    Stalking Horse Agreement Notice.  In the event that the Debtors enter into any Stalking Horse Agreement that the Debtors determine is in the best interests of the Debtors and their estates, the Debtors will file with the Court, and serve the Motion Notice Parties (as defined below), a notice (a "**Stalking Horse Notice**")[6] that shall include the following: (a) the identification of the Stalking Horse Purchaser, including any affiliations with the Debtors; (b) the Assets that are the subject of the Stalking Horse Agreement; (c) a copy of the Stalking Horse Agreement(s);[7] (d) the purchase price provided for in the Stalking Horse Agreement; (e) any

---

[6]    The Stalking Horse Notice that is served on the Motion Notice Parties (as defined below) need not attach a copy of the proposed Stalking Horse Agreement but, instead, shall indicate the manner in which the Motion Notice Parties may obtain a copy of the proposed Stalking Horse Agreement.

[7]    In the event that the Debtors determine to pursue a restructuring term sheet with a potential Stalking Horse Purchaser (the "**Restructuring Term Sheet**"), the Debtors will file a notice setting forth the material terms of

proposed Bid Protections (as defined below); and (g) the deposit paid by the Stalking Horse Purchaser.

16.    <u>Stalking Horse Bid Protections</u>.  As a condition to entering into the Stalking Horse Agreement, a Stalking Horse Purchaser may request reasonable bid protections, including either or both of a "**Break-Up Fee**" and an "**Expense Reimbursement**" (together "**Bid Protections**").  If the Debtors receive a Stalking Horse Agreement proposal prior to the initial hearing on this Motion, the Debtors will file a supplement to this Motion seeking authority to designate such agreement as a Stalking Horse Agreement and approving the Bid Protections.  If such an event transpires on that timeline, the Debtors will endeavor to consult with the Consultation Parties with respect to the designation of any Stalking Horse Purchaser and Stalking Horse Agreement prior to the submission of any proposed Stalking Horse Notice.

17.    If after the conclusion of the initial hearing on this Motion, no Stalking Horse Purchaser has been designated, the Debtors seek authority to continue to negotiate with and designate parties as a Stalking Horse Purchaser.  By the Bidding Procedures Order, the Debtors are requesting authority to designate, after the entry of the Bidding Procedures Order, a Stalking Horse Purchaser and Stalking Horse Agreement without further Court order so long as the following parameters are satisfied: (a) the Break-Up Fee does not exceed three percent (3.0%) of the aggregate cash purchase price; (b) the Expense Reimbursement does not exceed $350,000; and (c) the Consultation Parties affirmatively consent to the stalking horse designation on or prior to July 2, 2018 (the "**Stalking Horse Deadline**").  For the avoidance of doubt, however, the failure to meet any of the foregoing conditions shall not preclude the Debtors from seeking Court authorization to designate a Stalking Horse Purchaser and Stalking Horse Agreement, and the

---

such Restructuring Term Sheet.  The Debtors will endeavor to consult with the Consultation Parties with respect to the scope of matters covered by a Restructuring Term Sheet.

Debtors reserve the right to file a motion at any time on or before the Stalking Horse Deadline to designate a Stalking Horse Purchaser and Stalking Horse Agreement.

## C.    **Bidding Procedures**[8]

18.    The Bidding Procedures describe, among other things, (i) the Assets available for sale and the means by which interested parties may obtain additional information with respect thereto, (ii) the manner in which bids become "qualified," (iii) the coordination of diligence efforts among the bidders and the Debtors, (iv) the receipt and negotiation of bids received, (v) the conduct of any Auction(s), and (vi) the selection and approval of the Successful Bidder and the selection of the Back-Up Bidder.  Certain of the key terms of the Bidding Procedures, which shall apply to each Potential Bidder, the Qualifying Bidders, the submission, receipt, and analysis of all bids relating to any proposed Transaction, and the conduct of the Auction, are included below:

(a)    **Qualification as Bidder**: Any person or entity that wishes to participate in the bidding process for the Assets (each, a "**Potential Bidder**") must first become a "**Qualifying Bidder**."

To become a Qualifying Bidder (and thus being able to conduct due diligence and gain access to the Debtors' confidential electronic data room concerning the Assets (the "**Data Room**")), a Potential Bidder must submit to the Debtors and their advisors: (i) documentation identifying the interested party, its principals, and the representatives thereof who are authorized to appear and act on their behalf for all purposes regarding the contemplated Transaction; (ii) an executed confidentiality agreement in form and substance reasonably satisfactory to the Debtors, which by its terms will inure to the benefit of the Successful Bidder(s); (iii) a statement and other factual support demonstrating to the Debtors' reasonable satisfaction that the interested party has a bona fide interest in consummating a Transaction; and (iv) sufficient information, as determined by

---

[8]    Any summary of the Bidding Procedures contained herein is qualified in its entirety by the actual terms and conditions of the Bidding Procedures as provided for in the Bidding Procedures Order.  To the extent that there is any conflict between any summary contained herein and the actual terms and conditions of the Bidding Procedures as provided for in the Bidding Procedures Order, the actual terms and conditions of the Bidding Procedures as provided for in the Bidding Procedures Order shall control.  Capitalized terms used but not defined in this summary of the Bidding Procedures shall have the meanings ascribed to such terms in the Bidding Procedures.

the Debtors, to allow the Debtors to determine that the interested party (i) has, or can obtain, the financial wherewithal and any required internal corporate, legal or other authorizations to close a Transaction, including, but not limited to, current audited financial statements of the interested party (or such other form of financial disclosure acceptable to the Debtors in their discretion) and (ii) can provide adequate assurance of future performance under any executory contracts and unexpired leases to be assumed by the Debtors and assigned to such bidder, pursuant to section 365 of the Bankruptcy Code, in connection with a Transaction.

Notwithstanding anything to the contrary herein, and for the avoidance of doubt, for all purposes under the Bidding Procedures: (i) any designated Stalking Horse Purchaser shall be considered a Qualifying Bidder, and a Stalking Horse Agreement shall be considered a Qualifying Bid (as defined below); and (ii) in determining whether the Potential Bidders constitute Qualifying Bidders, the Debtors may consider a combination of bids for the Assets.

(b)     **Due Diligence**: The Debtors will provide any Qualifying Bidder with reasonable access to the Data Room and any other additional information that the Debtors believe to be reasonable and appropriate under the circumstances. All additional due diligence requests shall be directed to: Raymond James & Associates, Inc., the Debtors' investment bank, care of Jay Eastman (410-525-5176; Jay.Eastman@RaymondJames.com); and Geoff Richards (212-885-1885; Geoffrey.Richards@RaymondJames.com).

The due diligence period shall extend through and including the Bid Deadline. The Debtors may, but shall not be obligated to, in their sole discretion, furnish any due diligence information after the Bid Deadline. The Debtors reserve the right, in their reasonable discretion, to withhold or limit access to any due diligence information that the Debtors determine is business-sensitive or otherwise not appropriate for disclosure to a Qualifying Bidder. Notwithstanding any prepetition limitations, including, without limitation, any non-disclosure, confidentiality or similar provisions relating to any due diligence information, the Debtors and their estates shall be authorized to provide due diligence information to Qualifying Bidders provided that such Qualifying Bidders have delivered an executed confidentiality agreement in form and substance acceptable to the Debtors. The Debtors and their estates are not responsible for, and shall have no liability with respect to, any information obtained by, or provided to, any Qualifying Bidders in connection with the Bidding Procedures and a contemplated Transaction.

(c)     **Bid Requirements**:

i.      *Qualifying Bid*.  Other than in the case of a bid submitted by the Stalking Horse Purchaser, to be deemed a Qualifying Bid, a bid must be received from a Qualifying Bidder on or before the Bid Deadline and satisfy each

of the following requirements, as determined by the Debtors in consultation with the Consultation Parties (each, a "**<u>Bid Requirement</u>**")

a.  be in writing;

b.  fully disclose the identity of the Qualifying Bidder (and any other party participating in the bid) and provide the contact information of the specific person(s) whom the Debtors or their advisors should contact in the event that the Debtors have any questions or wish to discuss the bid submitted by the Qualifying Bidder;

c.  set forth the purchase price to be paid by such Qualifying Bidder or the material terms of a Restructuring Term Sheet;

d.  if a bid includes a credit bid under section 363(k), evidence of the amount of the claim, the Assets constituting the collateral securing the claim, and evidence of the grant, perfection, priority, and validity of the lien (the "**<u>Secured Claim Documentation</u>**");

e.  in the case of a proposed purchase of the Assets, not propose payment in any form other than cash (except as otherwise expressly set forth in these Bidding Procedures and the Bidding Procedures Order);

f.  state the liabilities proposed to be paid or assumed by such Qualifying Bidder or, if in the form of a plan, the treatment of each class of claims or equity interest under the plan;

g.  specify the Assets that are included in the bid and, to the extent a Stalking Horse Purchaser is designated, state that such Qualifying Bidder offers to purchase the Assets, or a number or combination of the Assets, upon substantially the same terms as, or terms more favorable to the Debtors and their estates than, the terms set forth in the Stalking Horse Agreement, as applicable;

h.  state that such Qualifying Bidder's offer is formal, binding and unconditional and is irrevocable until two (2) business days after the closing of the sale of the Assets (as applicable to sales, only);

i.  state that such Qualifying Bidder is financially capable of consummating the Transaction contemplated by the bid and provide written evidence in support thereof (including evidence of bridge financing in the case of a restructuring proposal);

j.  contain such financial and other information to allow the Debtors to make a reasonable determination as to the Qualifying Bidder's financial and other capabilities to close the transactions contemplated

by the proposal, including, without limitation, such financial and other information supporting the Qualifying Bidder's (or reorganized Debtors') ability to comply with the requirements of adequate assurance of future performance under section 365(f)(2)(B) and, if applicable, section 365(b)(3) of the Bankruptcy Code, including the Qualifying Bidder's financial wherewithal and willingness to perform under any contracts and leases that are assumed and assigned to the Qualifying Bidder, in a form that allows the Debtors to serve, within one (1) business day after such receipt, such information on any counterparties to any contracts or leases being assumed and assigned (or assumed) in connection with the Transaction that have requested, in writing, such information;

k.  identify with particularity each and every executory contract and unexpired lease the assumption and assignment of which is a condition to close the contemplated transaction(s);

l.  specify whether the Qualifying Bidder intends to operate all or a portion of the Debtors' business as a going concern;

m.  if the Transaction contemplated by the proposal is a sale, a commitment to close the Transaction by August 5, 2018;

n.  not request or entitle such Qualifying Bidder to any break-up fee, termination fee, expense reimbursement or similar type of fee or payment;

o.  in the event that there is a Stalking Horse Purchaser, the aggregate consideration proposed by the Qualifying Bidder must equal or exceed the sum of the amount of (A) the purchase price under the Stalking Horse Agreement, (B) any Break-Up Fee, (C) any Expense Reimbursement, and (D) $250,000;

p.  not contain any contingencies of any kind, including, without limitation, contingencies related to financing, internal approval or due diligence;

q.  contain a written acknowledgement and representation that the Qualifying Bidder (i) has had an opportunity to conduct any and all due diligence regarding the Assets, (ii) has relied solely upon its own independent review, investigation and/or inspection of any documents and other information in making its Qualifying Bid, and (iii) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Assets, or the

completeness of any documents or other information provided in connection with the Bidding Procedures and the proposed Transaction;

r.  sets forth (i) a statement or evidence that the Qualifying Bidder has made or will make in a timely manner all necessary filings under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, if applicable, and pay the fees associated with such filings and (ii) any regulatory and third-party approval required for the Qualifying Bidder to close the contemplated transactions, and the time period within which the Qualifying Bidder expects to receive such regulatory and third-party approvals (and in the case that receipt of any such regulatory or third-party approval is expected to take more than five (5) days following execution and delivery of such Qualifying Bidder's Purchase Agreement, those actions the bidder will take to ensure receipt of such approval(s) as promptly as possible); *provided* that a Qualifying Bidder agrees that its legal counsel will coordinate in good faith with Debtors' legal counsel to discuss and explain Qualifying Bidder's regulatory analysis, strategy, and timeline for securing all such approvals as soon as reasonably practicable; *provided*, *further* that the offer contains a covenant to cooperate with the Debtors to provide pertinent factual information regarding the bidder's operations reasonably required to analyze issues arising with respect to any applicable antitrust laws and other applicable regulatory requirements;

s.  provides for the Qualifying Bidder to serve as a backup bidder (the "**Back-Up Bidder**") if the Qualifying Bidder's bid is the next highest and best bid (the "**Back-Up Bid**") after the Successful Bid (as defined below);

t.  includes written evidence of authorization and approval from the Qualifying Bidder's board of directors (or comparable governing body) with respect to the submission, execution, and delivery of the subject term sheet;

u.  provides a good faith cash deposit (the "**Deposit**") in an amount equal to ten percent (10%) of the purchase price provided for in the proposal (or such additional amount as may be determined by the Debtors in their reasonable discretion and in consultation with the Consultation Parties) to be deposited, prior to the Bid Deadline, with an escrow agent selected by the Debtors (the "**Escrow Agent**") pursuant to the escrow agreement to be provided by the Debtors to the Qualifying Bidders (the "**Escrow Agreement**"); and

v.  provides for liquidated damages in the event of the Qualifying Bidder's breach of, or failure to perform under, the modified Purchase Agreement equal to the amount of the Deposit.

The Debtors reserve the right, in consultation with the Consultation Parties, to negotiate with any Qualifying Bidder in advance of the Auction to cure any deficiencies in a bid that is not initially deemed a Qualifying Bid.

Each Qualifying Bidder submitting a bid shall be deemed to: (a) acknowledge and represent that it is bound by all of the terms and conditions of the Bidding Procedures; and (b) have waived the right to pursue a substantial contribution claim under section 503 of the Bankruptcy Code related in any way to the submission of its bid, the Bidding Procedures, and the Sale.

ii.    *Bid Deadline*.  A Qualifying Bidder, other than any Stalking Horse Purchaser, that desires to make a bid shall deliver a written and electronic copy of its bid in both PDF and MS-WORD format to the Notice Parties so as to be received on or before **July 16, 2018 at 5:00 p.m. (ET)** (the "**Bid Deadline**"); *provided* that the Debtors may extend the Bid Deadline without further order of the Court, subject to providing notice to the Consultation Parties.  To the extent that the Bid Deadline is extended for all parties, the Debtors shall file a notice on the docket of these chapter 11 cases indicating the same.  **Any party that does not submit a bid by the Bid Deadline (including as extended in accordance with the prior two sentences) will not be allowed to (a) submit any offer after the Bid Deadline, or (b) participate in the Auction.**

iii.    *Evaluation of Qualifying Bids*.  The Debtors will deliver by no later than 9:00 a.m. (ET) on the day following the Bid Deadline, copies of all bids from Qualifying Bidders to each of the Consultation Parties.

The Debtors, in consultation with the Consultation Parties, shall make a determination regarding whether a timely submitted bid from a Qualifying Bidder is a Qualifying Bid, and shall notify all Qualifying Bidders whether their bids have been determined to be a Qualifying Bid by no later than 5:00 p.m. (ET) on the day before the commencement of the Auction.  In the event that a bid is determined not to be a Qualifying Bid, including with respect to any proposed credit bid amount, the Qualifying Bidder shall be notified by the Debtors and shall have until the commencement of the Auction to modify its bid to increase the purchase price or otherwise improve the terms of the Qualifying Bid for the Debtors and to provide additional Secured Claim Documentation; *provided* that any Qualifying Bid may be improved at the Auction as set forth herein.

Prior to commencing the Auction, the Debtors shall determine, in consultation with the Consultation Parties, which of the Qualifying Bids, at such time, is the highest or best bid for purposes of constituting the

opening bid of the Auction (the "**Baseline Bid**" and the Qualifying Bidder submitting the Baseline Bid, the "**Baseline Bidder**"), and shall notify any Stalking Horse Purchaser and all Qualifying Bidders with Qualifying Bids of the Baseline Bid no later than the opening of the Auction.

iv.    *No Qualifying Bids*.  If no timely Qualifying Bids other than any Stalking Horse Purchaser's Qualifying Bid are submitted on or before the Bid Deadline, the Debtors shall not hold an Auction and may request at the Sale Hearing that the Stalking Horse Purchaser (if any) be deemed the Successful Bidder (as defined herein) and that the Court approve the Stalking Horse Agreement (if any) and the transactions contemplated thereunder.

(d)    **Right to Credit Bid**.  Any Qualified Bidder who has a valid and perfected lien on any Assets of the Debtors' estates that is not subject to an objection by the commencement of the Auction (a "**Secured Creditor**") shall have the right to credit bid all or a portion of the value of such Secured Creditor's claim within the meaning of section 363(k) of the Bankruptcy Code and to the extent demonstrated by the Secured Claim Documentation; *provided* that a Secured Creditor shall have the right to credit bid its claim only with respect to the collateral by which such Secured Creditor is secured.

(d)    **Auction**.  If the Debtors timely receive one or more Qualifying Bids for any of the Assets (inclusive of any Stalking Horse Purchaser's Qualifying Bid), then the Debtors shall conduct an auction (the "Auction").  Following the Auction, the Debtors will determine, in consultation with the Consultation Parties, which Qualifying Bid is the highest or best bid for the Assets, which will be determined by considering, among other things, the following non-binding factors:

i.    the terms of the Purchase Agreement or Restructuring Term Sheet requested by each bidder;

ii.    the extent to which such terms are likely to delay closing of the Sale, the cost to the Debtors and their estates of such modifications or delay, and any incremental financing being offered to accommodate any delay;

iii.    the total consideration to be received by the Debtors and their estates;

iv.    the Transaction structure and execution risk, including conditions to, timing of closing, certainty of closing, termination provisions, availability of financing and financial wherewithal to meet all commitments, and required governmental or other approval;

v.    the net benefit to the Debtors' estates, taking into account any Break-Up Fee and any Expense Reimbursement provided for in any applicable Stalking Horse Agreement;

vi.    the impact on employees, trade creditors and lease and contract counterparties; and

vii.    any other factors the Debtors may reasonably deem relevant.

The Auction shall be governed by the following procedures:

i.    the Auction shall commence on **July 18, 2018 at 10:00 a.m. (ET)** (the "**Auction Date**"), at Young Conaway Stargatt & Taylor, LLP, 1000 King Street, Rodney Square, Wilmington, Delaware 19801;

ii.    only a Stalking Horse Purchaser and the other Qualifying Bidders with Qualifying Bids (collectively, the "**Auction Bidders**") shall be entitled to make any subsequent bids at the Auction;

iii.    the Auction Bidders shall appear in person at the Auction, or through a duly authorized representative;

iv.    only the Debtors, the Auction Bidders, the Consultation Parties, and the Debtors' creditors and equity holders, together with the professional advisors to each of the foregoing parties, may attend the Auction; provided that any creditors and equity holders desiring to attend the Auction must provide counsel for the Debtors one (1) business day's written notice of their intent to attend the Auction;

v.    the Debtors and their professional advisors shall direct and preside over the Auction, which shall be transcribed;

vi.    the Auction Bidders shall confirm that they have not engaged in any collusion with respect to the Bidding Procedures, the Auction or the Sale;

vii.    bidding shall commence at the amount of the Baseline Bid, and the Auction Bidders may submit successive bids in increments of at least the lesser of $500,000 and 1% of the current highest and best bid (or Baseline Bid for the first round) (the "**Bid Increment**"); *provided* that:  (i) each such successive bid must be a Qualifying Bid; (ii) if the then-highest and best bid was made by any Stalking Horse Purchaser, such bid shall be deemed to include the sum of the amount of, if applicable, (A) any Break-Up Fee and (B) any Expense Reimbursement; (iii) any successive bid made by any Stalking Horse Purchaser shall only be required to equal the sum of the amount of (A) the Baseline Bid or the then-highest and best bid, as applicable, plus (B) the Bid Increment, less (C) the sum of the amount of, if applicable, (X) any Break-Up Fee and (Y) any Expense Reimbursement; and (iv) the Debtors shall retain the right to modify the bid increment requirements at the Auction; *provided*, *further*, that the

Debtors, in consultation with the Consultation Parties, reserve the right to modify the Bid Increment during the course of the Auction and shall do so on the record at the Auction;

viii.   the Auction may include individual negotiations with any of the Auction Bidders, but all bids shall be made on the record and in the presence of all of the Auction Bidders;

ix.   all material terms of the bid that is deemed to be the highest and best bid for each round of bidding shall be fully disclosed to the Auction Bidders, and the Debtors shall use reasonable efforts to clarify any and all questions that the Auction Bidders may have regarding the Debtors' announcement of the then-current highest and best bid;

x.   the Debtors and their professional advisors, in consultation with the Consultation Parties, may employ and announce at the Auction additional procedural rules that are reasonable under the circumstances (*e.g.*, the amount of time allotted to make subsequent bids) for conducting the Auction, provided that such rules are (i) not inconsistent with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, or any applicable order of the Court entered in connection with these chapter 11 cases, including, without limitation, the Bidding Procedures Order, and (ii) disclosed to the Auction Bidders;

xi.   each Auction Bidder shall (i) be deemed to have waived any right to a jury trial in connection with, and consented and submitted to the exclusive jurisdiction of the Court over, any actions or proceedings arising from or relating the Bidding Procedures, the Sale, the Auction and the construction and enforcement of the contemplated transaction documents of the Auction Bidders, (ii) bring any such action or proceeding in the Court, and (iii) be deemed to have consented to the Court entering a final judgment determining any such action or proceeding and that such final judgment in any such action or proceeding, including all appeals, shall be conclusive and may be enforced in other jurisdictions (including any foreign jurisdictions) by suit on the judgment or in any other manner provided by applicable law;

xii.   Auction Bidders shall have the right to make additional modifications to their respective Purchase Agreements or any Stalking Horse Agreement, as applicable, in conjunction with each Qualifying Bid submitted in each round of bidding during the Auction, provided that (i) any such modifications on an aggregate basis and viewed in whole, shall not, in the Debtors' discretion, in consultation with the Consultation Parties, be less favorable to the Debtors and their estates than the terms of the Auction Bidders' respective Purchase Agreements or any Stalking Horse Agreement, as applicable, and (ii) each Qualifying Bid shall constitute an

irrevocable offer and shall be binding on the Auction Bidder submitting such bid until such party shall have submitted a subsequent Qualifying Bid at the Auction or the conclusion of the Sale Hearing, whichever occurs sooner, unless such bid is selected as the Successful Bid or the Back-Up Bid, which shall remain binding as provided for herein;

xiii.    the Debtors and the Consultation Parties shall have the right to request any additional financial information that will allow the Debtors and the Consultation Parties to make a reasonable determination as to an Auction Bidder's financial and other capabilities to consummate the transactions contemplated by their proposal or any Stalking Horse Agreement, as applicable, as may be amended during the Auction, and any further information that the Debtors may believe is reasonably necessary to clarify and evaluate any bid made by an Auction Bidder during the Auction;

xiv.    upon the conclusion of the Auction, the Debtors shall determine, in consultation with the Consultation Parties, and subject to Court approval, the offer or offers for the Assets that is or are the highest or best from among the Qualifying Bids submitted at the Auction, which may be a Stalking Horse Agreement (the "**Successful Bid**").    In making this decision, the Debtors shall consider, in consultation with the Consultation Parties, the amount of the purchase price, the likelihood of the bidder's ability to close a transaction and the timing thereof, the nature and impact of any variances from the form Purchase Agreement requested by each bidder, and the net benefit to the Debtors' estates.  The bidder submitting such Successful Bid, which may be the Stalking Horse Purchaser, shall become the "**Successful Bidder**," and shall have such rights and responsibilities of the purchaser as set forth in the subject Purchase Agreement, as applicable.  The Debtors may, in their sole discretion, designate Back-Up Bids (and the corresponding Back-Up Bidders) to purchase the Assets in the event that the Successful Bidder does not close the Sale; and

xv.    prior to the Sale Hearing, the Successful Bidder shall complete and execute all agreements, contracts, instruments and other documents evidencing and containing the terms and conditions upon which the Successful Bid was made.

**THE SUCCESSFUL BID AND ANY BACK-UP BIDS SHALL CONSTITUTE AN IRREVOCABLE OFFER AND BE BINDING ON THE SUCCESSFUL BIDDER AND THE BACK-UP BIDDER, RESPECTIVELY, FROM THE TIME THE BID IS SUBMITTED UNTIL TWO (2) BUSINESS DAYS AFTER THE SALE HAS CLOSED.    EACH QUALIFYING BID THAT IS NOT THE SUCCESSFUL BID OR BACK-UP BID SHALL BE DEEMED WITHDRAWN AND TERMINATED AT THE CONCLUSION OF**

**THE SALE HEARING. NOTWITHSTANDING ANYTHING HEREIN TO THE CONTRARY, IF THE SUCCESSFUL BID IS IN THE FORM OF A RESTRUCTURING TERM SHEET, ANY BACK-UP BID SHALL REMAIN IRREVOCABLE AND BINDING ON THE BACK-UP BIDDER UNTIL TWO (2) BUSINESS DAY AFTER THE ENTRY OF AN ORDER CONFIRMING THE SUCCESSFUL BID IN THE FORM OF A RESTRUCTURING TERM SHEET AS THE SUCCESSFUL BID (OR SUCH FURTHER PERIOD SET FORTH IN ANY ORDER ENTERED AT THE SALE HEARING)**

(e)    **Sale Hearing**.  The Successful Bid and any Back-Up Bid (or if no Qualifying Bid other than that of any Stalking Horse Purchaser is received, then the Stalking Horse Agreement) will be subject to approval by the Court.  The hearing to approve such Successful Bid and any Back-Up Bid (the "**Sale Hearing**") shall take place, subject to the Court's availability, on **July 23, 2018** at _____(**ET**). The Sale Hearing may be adjourned by the Debtors from time to time without further notice to creditors or other parties in interest other than by announcement of the adjournment in open court on the date scheduled for the Sale Hearing or by filing a hearing agenda or notice on the docket of the Debtors' chapter 11 cases. **For the avoidance of doubt, by no later than the time of announcement of the Baseline Bid for the Auction, the Debtors may determine, in consultation with the Consultation Parties, to withdraw the Assets or any subset thereof, from the Auction and sale process, and adjourn the Sale Hearing with respect to these Assets on the terms set forth herein.**

At the Sale Hearing, the Debtors will seek entry of an order that, among other things:

(i) authorizes and approves the Sale to the Successful Bidder (and, if applicable the Back-Up Bidder), pursuant to the terms and conditions set forth in the applicable Stalking Horse Agreement or Purchase Agreement executed by the Successful Bidder (and, if applicable the Back-Up Bidder), and that the Assets being transferred in such transaction shall be transferred free and clear of all liens claims and Encumbrances pursuant to section 363(f) of the Bankruptcy Code;

(ii) unless otherwise ordered by the Court, directing that all Encumbrances on the Assets that are sold shall attach to the cash proceeds generated from the sale of such Assets in the same order of priority as they existed prior to the consummation of such sale;

(iii) finding that the Stalking Horse Purchaser or Successful Bidder, as applicable, is a good faith purchaser pursuant to section 363(m) of the Bankruptcy Code; and

(iv) as appropriate, exempting the Sale(s) and conveyance(s) of the Assets from any transfer tax, stamp tax or similar tax, or deposit under any applicable bulk sales statute.  Notwithstanding anything in the foregoing to the contrary, if the Successful Bid is in the form of a Restructuring Term Sheet, the Debtors will seek authorization to proceed with the Transaction contemplated by such Restructuring Term Sheet, including all other relief necessary to proceed with implementation of such a Transaction.

(f)     **Back-Up Bidder**.  Notwithstanding any of the foregoing, in the event that the Successful Bidder fails to close the Sale by August 5, 2018 (or such date as may be extended by the Debtors, in consultation with the Consultation Parties, and with the agreement of the Back-Up Bidder), the Back-Up Bid will be deemed to be the Successful Bid, the Back-Up Bidder will be deemed to be the Successful Bidder, and the Debtors will be authorized, but not directed, to close the Sale to the Back-Up Bidder subject to the terms of the Back-Up Bid without the need for further order of the Court and without the need for further notice to any interested parties, as soon as practicable, but not later than August 15, 2018.

(g)     **Return of Deposits**.  All Deposits shall be returned to each bidder not selected by the Debtors as the Successful Bidder or the Back-Up Bidder no later than three (3) business days following the conclusion of the Sale Hearing.  The deposit of the Successful Bidder or, if the Sale is closed with the Back-Up Bidder, the deposit of the Back-Up Bidder, shall be applied to the purchase price for the Sale.  If the Successful Bidder (or, if the Sale is to be closed with the Back-Up Bidder, then the Back-Up Bidder) fails to consummate the Sale because of a breach or failure to perform on the part of such bidder, then, subject to the terms of the Purchase Agreement or any Stalking Horse Agreement, as applicable, the Debtors and their estates shall be entitled to retain the Deposit of the Successful Bidder (or, if the Sale is to be closed with the Back-Up Bidder, then the Back-Up Bidder) as part of the damages resulting to the Debtors and their estates for such breach or failure to perform.

(h)     **Reservation of Rights**.  Notwithstanding any of the foregoing, the Debtors and their estates reserve the right to, after consultation with the Consultation Parties, modify these Bidding Procedures at or prior to the Auction, including, without limitation, to extend the deadlines set forth herein, allow for bidding on only a portion of the Assets and not all of them, modify bidding increments, waive terms and conditions set forth herein with respect to any or all potential bidders (including, without limitation, the Bid Requirements), impose additional terms and conditions with respect to any or all Potential Bidders, adjourn or cancel the Auction at or prior to the Auction, and adjourn the Sale Hearing.

19.    The Bidding Procedures establish the following key dates for the sale process:

| Opening of Data Room | June 4, 2018 |
| --- | --- |
| Bidding Procedures Hearing | June 25, 2018 |
| Deadline to serve Assumption Notice | June 29, 2018 |
| Stalking Horse Designation Deadline | July 2, 2018 |
| Bid Deadline | July 16, 2018 at 5:00 p.m. (ET) |
| Deadline to object to Sale (other than with respect to the conduct of the Auction and designation of a Successful Bidder) | July 16, 2018 at 4:00 p.m. (ET) |
| Deadline to object to Assumption Notice | July 16, 2018 at 4:00 p.m. (ET) |
| Auction commencement | July 18, 2018 at 10:00 a.m. (ET) |
| Deadline to object to conduct of Auction and designation of Successful Bidders, and adequate assurance | July 20, 2018 at 4:00 p.m. (ET) |
| Sale Hearing | July 23, 2018 at 1:30 p.m. (ET) |

20.    The Debtors respectfully submit that the timeline set forth in the Bidding Procedures is reasonable and necessary under the circumstances of these chapter 11 cases.  This timeline provides approximately seven (7) weeks between the Petition Date and the Bid Deadline, on top of the prepetition marking process that commenced in April.  This period will allow parties in interest sufficient time to formulate bids for the Assets.  Moreover, relevant information regarding the Assets will be made available in the Data Room during the Debtors' marketing process, allowing potential bidders to conduct due diligence.  Bidder will be provided with immediate access to the information regarding the Debtors' Assets contained in the Data Room, subject to the execution of an appropriate confidentiality agreement as described in the Bidding Procedures and herein.

**D.**    **Notice Procedures for the Sale, Bidding Procedures, Auction, and Sale Hearing**

21.    The Debtors also request approval of the sale notice (the "**Sale Notice**"), substantially in the form attached to the Bidding Procedures Order as Exhibit 3.

22.    The Debtors will serve the Sale Notice by email, mail, or facsimile within two (2) business days of entry of the Bidding Procedures Order upon:  (1) the Office of the United States Trustee for the District of Delaware; (2) counsel to Wells Fargo Bank, N.A.; (3) counsel to Capital Farm Credit, FLCA; (4) counsel to Black Diamond Commercial Finance, L.L.C.; (4) all parties known by the Debtors to assert a lien on any of the Assets; (5) all persons known or reasonably believed to have expressed an interest in acquiring all or a substantial portion of the Assets in the Debtors within the twelve (12) months prior to the Petition Date; (6) the Office of the United States Attorney for the District of Delaware; (7) the Office of the Attorney General in each state in which the Debtors operate or sell their goods; (8) the Office of the Secretary of State in each state in which the Debtors operate or are organized; (9) all taxing authorities having jurisdiction over any of the Assets, including the Internal Revenue Service; (10) all environmental authorities having jurisdiction over any of the Assets, including the Environmental Protection Agency; (11) all of the Debtors' other known creditors and equity security holders, including the Counterparties; and (12) all other parties that had filed a notice of appearance and demand for service of papers in these chapter 11 cases as of the service date (collectively, the "**Sale Notice Parties**").

23.    The Debtors will cause the Sale Notice to be published once in the national edition of either *The New York Times*, *USA Today*, or the *Wall Street Journal* as soon as practicable after entry of the Bidding Procedures Order.

24.     The Debtors will also post the Sale Notice and the Bidding Procedures Order on the website of the Debtors' claims and noticing agent (the "**Claims Agent Website**").

**E.      Assumption and Assignment Procedures**

25.     To facilitate the Sale, the Debtors seek authority to assume and assign to the Successful Bidder(s) any of the Target Contracts selected by the Successful Bidder in accordance with the Assumption and Assignment Procedures.

26.     The Assumption and Assignment Procedures are as follows:

(a)     On or before June 29, 2018 (the "**Assumption Notice Deadline**"), the Debtors shall file with the Court and serve on each counterparty (each, a "**Counterparty**," and collectively, the "**Counterparties**") to a Target Contract a notice, substantially in the form attached to the Bidding Procedures Order as Exhibit 3 (the "**Assumption Notice**").

(b)     The Assumption Notice shall include, without limitation, the cure amount (each, a "**Cure Amount**"), if any, that the Debtors believe is required to be paid to the applicable Counterparty under section 365(b)(1)(A) and (B) of the Bankruptcy Code for each of the Target Contracts.

(c)     If after the Assumption Notice Deadline additional executory contracts or unexpired leases of the Debtors are determined to be Target Contracts (such additional contracts, the "**Additional Contracts**"), as soon as practicable thereafter and in no event less than one (1) business day before the commencement of the Auction, the Debtors shall file with the Court and serve, by overnight delivery, on the affected Counterparties an Assumption Notice, and such Counterparties shall file any Contract Objections (as defined below) not later than: (i) the Contract Objection Deadline (as defined below) in the event that such Assumption Notice was filed and served within five (5) days of the Assumption Notice Deadline and (ii) two (2) hours prior to the commencement of the Sale Hearing in the event that such Assumption Notice was filed and served more than five (5) days after the Assumption Notice Deadline.

(d)     As soon as reasonably practicable after the conclusion of the Auction, the Debtors shall file with the Court and post of the Claims Agent Website a notice identifying the Successful Bidder (a "**Notice of Successful Bidder**"), which shall set forth, among other things, (i) the Successful Bidder and Back-Up Bidder (if any), (ii) the Selected Target Contracts (as defined below), (iii) the proposed assignee(s) of such Selected Target Contracts, and (iv) contact information of the proposed assignee, so that Counterparties to the Selected Target Contracts may obtain the Successful

Bidder's Adequate Assurance Information (as defined below), which shall be provided to each affected Counterparty on a confidential basis.

(e)     No later than one (1) business day after conclusion of the Auction, the Debtors will cause to be served by overnight mail the Notice of Successful Bidder upon each affected Counterparty and all parties requesting notice under Bankruptcy Rule 2002.

(f)     If a Counterparty objects to (i) the Cure Amount for its Target Contract, (ii) the Debtors' ability to assume and assign the Target Contract, or (iii) the provision of adequate assurance of future performance, the Counterparty must file with the Court and serve on the Objection Notice Parties (as defined below) a written objection (a "**Contract Objection**"). Any Contract Objection shall: (i) be in writing; (ii) comply with the Bankruptcy Rules and the Local Rules; (iii) be filed with the Clerk of the Court, 824 N. Market Street, 3rd Floor, Wilmington, Delaware 19801, together with proof of service, **on or before 4:00 p.m. (ET) on July 16, 2018** (the "**Contract Objection Deadline**"); (iv) be served, so as to be actually received on or before the Contract Objection Deadline, upon the Objection Notice Parties; and (v) state with specificity the grounds for such objection, including, without limitation, the fully liquidated cure amount and the legal and factual bases for any unliquidated cure amount that the Counterparty believes is required to be paid under section 365(b)(1)(A) and (B) of the Bankruptcy Code for the Target Contract, along with the specific nature and dates of any alleged defaults, the pecuniary losses, if any, resulting therefrom, and the conditions giving rise thereto. If any Stalking Horse Purchaser is designated the Successful Bidder in accordance with the Bid Procedures, any objections to adequate assurance of performance by such Stalking Horse Purchaser shall be filed by the Contract Objection Deadline. Any objections to adequate assurance of future performance by a Successful Bidder other than a Stalking Horse Purchaser shall be filed not later than two (2) hours prior to the commencement of the Sale Hearing.

(g)     The "**Objection Notice Parties**" are as follows: (i) counsel to the Debtors, Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington, Delaware 19801 (Attn: M. Blake Cleary, Esq., Sean T. Greecher, Esq., and Ryan M. Bartley, Esq.); (ii) proposed counsel to any official committee of unsecured creditors appointed in the Debtors' chapter 11 cases; (iii) counsel to Wells Fargo Bank, N.A.; (iv) counsel to Capital Farm Credit, FLCA; (v) the Office of the United States Trustee for the District of Delaware, 855 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801 (Attn: Jane M. Leamy, Esq.); and (vi) counsel to the Stalking Horse Purchaser, if any.

(h)     At the Sale Hearing, the Debtors will seek Court approval of the assumption and assignment to any Successful Bidder of only those Target

Contracts that have been selected by any Successful Bidder to be assumed and assigned (each, a "**Selected Target Contract**," and collectively, the "**Selected Target Contracts**").  The Debtors and their estates reserve any and all rights with respect to any Target Contracts that are not ultimately selected as Selected Target Contracts.

(i)     If no Contract Objection is timely received with respect to a Selected Target Contract: (i) the Counterparty to such Selected Target Contract shall be deemed to have consented to the assumption by the Debtors and assignment to the Successful Bidder of the Selected Target Contract, and be forever barred from asserting any objection with regard to such assumption and assignment (including, without limitation, with respect to adequate assurance of future performance by the Successful Bidder); (ii) any and all defaults under the Selected Target Contract and any and all pecuniary losses related thereto shall be deemed cured and compensated pursuant to section 365(b)(1)(A) and (B) of the Bankruptcy Code; and (iii) the Cure Amount for such Selected Target Contract shall be controlling, notwithstanding anything to the contrary in such Selected Target Contract, or any other related document, and the Counterparty shall be deemed to have consented to the Cure Amount and shall be forever barred from asserting any other claims related to such Selected Target Contract against the Debtors and their estates or any Successful Bidder, or the property of any of them, that existed prior to the entry of the Sale Order.

(j)     To the extent that the parties are unable to consensually resolve any Contract Objection prior to the commencement of the Sale Hearing, including, without limitation, any dispute with respect to the cure amount required to be paid to the applicable Counterparty under section 365(b)(1)(A) and (B) of the Bankruptcy Code (any such dispute, a "**Cure Dispute**"), such Contract Objection will be adjudicated at the Sale Hearing or at such other date and time as may be determined by the Debtors and the Successful Bidder or fixed by the Court; provided, however, that if the Contract Objection relates solely to a Cure Dispute, the Selected Target Contract may be assumed by the Debtors and assigned to any Successful Bidder, provided that the cure amount that the Counterparty asserts is required to be paid under section 365(b)(1)(A) and (B) of the Bankruptcy Code (or such lower amount as agreed to by the Counterparty) is deposited in a segregated account by the Debtors or the Successful Bidder, pending the Court's adjudication of the Cure Dispute or the parties' consensual resolution of the Cure Dispute.

(k)     Notwithstanding anything to the contrary herein, if after the Sale Hearing or the entry of the Sale Order additional executory contracts or unexpired leases of the Debtors are determined to be Target Contracts, as soon as practicable thereafter, the Debtors shall file with the Court and serve, by overnight delivery, on the Counterparties an Assumption Notice, and such Counterparties shall file any Contract Objections not later than fourteen

(14) days thereafter.  If no Contract Objection is timely received, the Debtors shall be authorized to assume and assign such Target Contracts to any Successful Bidder, without further notice to creditors or other parties in interest and without the need for further order of the Court, and such assumption and assignment shall be subject to the terms of the Sale Order.

**BASIS FOR RELIEF**

**A.      Sufficient Business Justification Exists for Consummation of the Sale Under Sections 105(a) and 363(b) of the Bankruptcy Code**

29.      Pursuant to section 105(a) of the Bankruptcy Code, a "[c]ourt may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).  Section 363(b) of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b).  Although section 363(b) does not specify a standard for determining when it is appropriate for a court to authorize the use, sale or lease of property of the estate, courts have required that such use, sale or lease be based upon the sound business judgment of the debtor.  *See, e.g., Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (internal citation omitted); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070–71 (2d Cir. 1983); *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143, 147–48 (3d Cir. 1986) (implicitly adopting the "sound business judgment" test of *In re Lionel Corp.*); *In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 175–76 (D. Del. 1991) (holding that the Third Circuit adopted the "sound business judgment" test in *Abbotts Dairies*); *Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.)*, 242 B.R. 147, 153 (D. Del. 1999) (same).

30.      The demonstration of a valid business justification by the debtor leads to a strong presumption "that in making [the] business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best

interests of the company." *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc.* *(In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (Bankr. S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)).

31.     The Debtors' decision to pursue a sale of the Assets represents a reasonable exercise of the Debtors' business judgment, and, accordingly, the Debtors should be authorized to sell the Assets, subject to the outcome of the auction process described herein, under sections 105(a) and 363(b) of the Bankruptcy Code.  The Debtors believe that the optimal result for all stakeholders will be reached by preserving their business and Assets as a going concern.  The Debtors began pre-petition, and will continue to conduct post-petition, an extensive process to market the Assets.  The open and fair auction and sale process contemplated by the Bidding Procedures will ensure that the Debtors' estates receive the highest or otherwise best value available for the Assets by allowing the market to determine the purchase price of the Assets and, the Debtors believe, will provide a greater recovery than would be provided by any other available alternative.  Moreover, the Debtors and their advisors are committed to entertaining and pursuing all value-maximizing alternatives and, accordingly, will be soliciting interest for both sales of the Assets or alternative restructuring proposals to ensure that they derive the highest or otherwise best value for the Assets.  Furthermore, compliance with the Bidding Procedures will ensure the fairness and reasonableness of the consideration to be paid by the Stalking Horse Purchaser or other Successful Bidder, and establish that the Debtors and such bidder have proceeded in good faith.

32.     Additionally, the Debtors believe that the notice procedures described above are reasonable and adequate under the circumstances.  Bankruptcy Rules 2002(a) and (c) require the Debtors to notify creditors of the Sale, the terms and conditions of the Sale, the time and place of

the Auction, and the deadline for filing any objections.  The Debtors believe that the proposed

notice procedures fully comply with Bankruptcy Rule 2002, and are reasonably calculated to

provide timely and adequate notice of any Stalking Horse Agreement, the Sale, Bidding

Procedures, Auction, and Sale Hearing to the Debtors' creditors and all other parties in interest

that are entitled to notice, as well as those parties that have expressed a *bona fide* interest in

acquiring the Assets.

33.     Accordingly, the proposed Sale is the best path forward for maximizing

recoveries to the Debtors' estates, their creditors, and all parties in interest, given both the open

nature of the proposed process and the need for a Sale to occur given the Debtors' current

financial circumstances as outlined in the First Day Declaration.  The Debtors submit that ample

business justification exists for the consummation of Sale and, therefore, request that the Court

approve such Sale.

**B.     The Sale of the Assets Free and Clear of All Encumbrances Is Authorized Under
Section 363(f) of the Bankruptcy Code**

34.     Section 363(f) of the Bankruptcy Code authorizes a debtor to sell assets free and

clear of liens, claims, interests and encumbrances if:

> (1) applicable nonbankruptcy law permits sale of such property free and
> clear of such interest; (2) such entity consents; (3) such interest is a lien
> and the price at which such property is to be sold is greater than the
> aggregate value of all liens on such property; (4) such interest is in bona
> fide dispute; or (5) such entity could be compelled, in a legal or equitable
> proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).  This provision is supplemented by section 105(a) of the Bankruptcy Code,

which provides that "[t]he court may issue any order, process or judgment that is necessary or

appropriate to carry out the provisions of [the Bankruptcy Code]."  11 U.S.C. § 105(a).Because

section 363(f) of the Bankruptcy Code is drafted in the disjunctive, satisfaction of any one of its

five requirements will suffice to permit the sale of the Assets "free and clear" of liens and

interests. *See Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 345 (Bankr. E.D. Pa. 1988) (noting that because section 363(f) is written in the disjunctive, a court may approve a sale free and clear if any one subsection is met); s*ee also Mich. Emp't Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.)*, 930 F.2d 1132, 1147 n.24 (6th Cir. 1991) (same); *In re Bygaph, Inc.*, 56 B.R. 596, 606 n.8 (Bankr. S.D.N.Y. 1986) (same). Furthermore, a debtor possesses broad authority to sell assets free and clear of liens. *See In re Trans World Airlines, Inc.*, 322 F.3d 283, 289 (3d Cir. 2003).

40.    The Debtors submit that, to attract the highest or otherwise best value for creditors, it is appropriate to sell their Assets on a final "as is" basis, free and clear of any and all Encumbrances (except as otherwise expressly set forth in the Sale Order and a Stalking Horse Agreement or a Purchase Agreement with a Successful Bidder, as applicable) in accordance with section 363(f) of the Bankruptcy Code because one or more of the tests of section 363(f) are satisfied with respect to such Sale.

41.    In particular, the Debtors believe that they will meet section 363(f)(2) of the Bankruptcy Code with respect to the Debtors' prepetition secured lenders that have a first-lien position on any of the Assets because the Debtors' prepetition secured lenders will consent to the Sale.  In fact, Wells Fargo, who has a first lien position on the Debtors' personal property, is requiring a sale process as a condition to its consent to the use of its cash collateral.  Moreover, with respect to any other party asserting a lien, claim, or encumbrance against the Assets, the Debtors anticipate that they will be able to satisfy one or more of the conditions set forth in section 363(f) of the Bankruptcy Code.  In particular, known lienholders will receive notice and will be given sufficient opportunity to object to the relief requested.  Such lienholders that do not object to the Sale should be deemed to have consented. *See FutureSource LLC v. Reuters Ltd.*,

312 F.3d 281, 285-86 (7th Cir. 2002) ("[L]ack of objection (provided of course there is notice) counts as consent.  It could not be otherwise; transaction costs would be prohibitive if everyone who might have an interest in the bankrupt's assets had to execute a formal consent before they could be sold.") (internal citations omitted); *Hargrave v. Twp. of Pemberton (In re Tabone, Inc.)*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (holding that creditor's failure to object to sale free and clear of liens, claims and encumbrances satisfies section 363(f)(2)); *In re Elliot*, 94 B.R. at 345 (same).  Consistent with the foregoing, the Bidding Procedures Order provides that the absence of a timely objection to the sale of the Assets in accordance therewith shall be "consent" to such sale within the meaning of section 363(f)(2) of the Bankruptcy Code.

42.     To the extent that any junior lenders do not consent to the Sale, the Debtors will demonstrate that such sale is appropriate under either or both of sections 363(f)(3) and (5) of the Bankruptcy Code.  *See, e.g., In Re Boston Generating, LLC*, 440 B.R. 302 (Bankr. S.D.N.Y. 2010).

43.     Furthermore, the Debtors propose that any Encumbrances asserted against the Assets be transferred to and attach to the proceeds of such Sale.

**C.     Secured Parties Should Be Authorized to Credit Bid on the Assets under Section 363(k) of the Bankruptcy Code**

44.     Section 363(k) of the Bankruptcy Code provides that, unless the court for cause orders otherwise, the holder of a claim secured by property that is the subject of a sale "may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property."  11 U.S.C. § 363(k).  Even if a secured creditor is undersecured as determined in accordance with section 506(a) of the Bankruptcy Code, section 363(k) allows such secured creditor to bid the full face value of its claim and does

not limit the credit bid to the claim's economic value. *See Cohen v. KB Mezzanine Fund II, LP (In re Submicron Sys. Corp.)*, 432 F.3d 448, 459-60 (3d Cir. 2006).

45.     As a result, the Debtors propose that any party that holds claims, that is not subject to objection by the start of the Auction, that are secured by valid, binding, enforceable, non-avoidable and perfected liens on and security interests in an Asset, be permitted to submit a credit bid for the Assets subject to those liens and security interest, subject to providing Secured Claim Documentation (as defined in the Bidding Procedures) satisfactory to the Debtors.

**D.     The Sale Should Be Subject to the Protections of Section 363(m) of the Bankruptcy Code**

44.     Section 363(m) of the Bankruptcy Code provides, in part, that the reversal or modification on appeal of an authorization of a sale pursuant to section 363(b) or section 363(c) of the Bankruptcy Code does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal. *See* 11 U.S.C. § 363(m).   In approving the Sale free and clear of Encumbrances, the Debtors request that the Court find and hold that all purchasers of Assets purchased in accordance with the Bidding Procedures are entitled to the protections afforded by section 363(m) of the Bankruptcy Code.   Such relief is appropriate in that selection of the Successful Bidder will be the result of a competitive bidding process and arm's-length, good-faith negotiations, and parties in interest will have the opportunity to review and object to a proposed transaction. *See Esposito v. Title Ins. Co. of Pa. (In re Fernwood Mkts.)*, 73 B.R. 616, 620 (Bankr. E.D. Pa. 1987) (good faith purchasers are protected under section 363(m) where notice is provided to lienholders).

E.    **The Court Should Approve the Bidding Procedures**

61.    The key objective in any sale of property of a debtor's estate is to maximize the value received by the estate. *See In re Mushroom Transp. Co.*, 382 F.3d 325, 339 (3d Cir. 2004) (finding that debtor "had a fiduciary duty to protect and maximize the estate's assets"); *Official Comm. of Unsecured Creditors of Cybergenics, Corp v. Chiner*y, 330 F.3d 548, 573 (3d Cir. 2003) (same). Procedures used to enhance competitive bidding support this objective and, therefore, are appropriate in the context of bankruptcy sales. *See Calpine Corp. v. O'Brien Environmental Energy, Inc. (In re O'Brien Environmental Energy, Inc.)*, 181 F.3d 527, 537 (3d Cir. 1999) ("**_O'Brien_**"); *see also Integrated Res. Inc.*, 147 B.R. at 659 (stating that bidding procedures "encourage bidding and . . . maximize the value of the debtor's assets").

62.    The Debtors have designed the Bidding Procedures to promote a competitive and fair bidding process and, thus, to maximize value for the Debtors' estates and creditors. The Bidding Procedures will allow the Debtors to conduct the Auction in a controlled, fair and open fashion that will encourage participation by financially capable bidders, thereby increasing the likelihood that the Debtors will receive the highest or best possible consideration for the Assets. Furthermore, the Bidding Procedures provide an appropriate framework for the Debtors to review, analyze and compare any bids received to determine which bids are in the best interests of the Debtors' estates and their creditors.

63.    Finally, the timeline under the Bidding Procedures is appropriate in light of the Debtors' business needs. As described in the First Day Declaration, the Debtors' business is highly seasonal. A significant part of the Debtors' business involves the sales of holiday plants, namely poinsettias, and the growing season for those plants commences in August of each year. Accordingly, the Debtors believe that it is critical to the value of the Debtors' business, including the preservation of their customer relationships, that a committed purchaser with fresh capital be

in place at the start of that season to ensure that production needs are met.  The timeline under the Bidding Procedures accomplishes that goal.  Further, the marketing process provided for prior to the Bid Deadline will benefit from the extensive outreach conducted by Raymond James beginning in April, and the Debtors and their advisors believe that this aggregate period will be sufficient to fully canvass the market for interest in a Transaction.

48.    The Debtors submit that the Bidding Procedures are fair, transparent and will derive the highest or best bids for the Assets.  Therefore, the Debtors request that the Court approve the Bidding Procedures, including, without limitation, the dates established thereby for the Auction and the Sale Hearing.

**F.    Bidding Protections are in the Best Interests of the Debtors and their Estates and Should be Authorized**

27.    The United States Court of Appeals for the Third Circuit recognizes that bid protections, including traditional breakup fees and expense reimbursement provisions, will be approved where they are necessary for the preservation of the debtor's estate.  *See, e.g., In re Reliant Energy Channelview LP*, 594 F.3d 200, 206 (3d Cir. 2010) (citing *O'Brien*, 181 F.3d at 537); *see also Integrated Res.*, 147 B.R. at 659 (bidding procedures "encourage bidding and . . . maximize the value of the debtor's assets").  In *O'Brien*, the Third Circuit held that even though bidding incentives are measured against a business judgment standard in non-bankruptcy transactions, the administrative expense provisions of section 503(b) of the Bankruptcy Code govern in the bankruptcy context.  Accordingly, to be approved, bidding incentives must benefit a debtor's estate.  *O'Brien*, 181 F.3d at 533.

35.    The Third Circuit identified at least two instances in which bidding incentives may benefit the estate.  First, benefit may be found if "assurance of break-up fee promoted more competitive bidding, such as by inducing a bid that otherwise would not have been made and

without which bidding would have been limited." *Id.* at 537. Second, where the availability of bidding incentives induce a bidder to research the value of the debtor and submit a bid that serves as a minimum or floor bid on which other bidders can rely, "the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth." *Id.*

36.     In *O'Brien*, the Third Circuit referred to nine factors that the bankruptcy court viewed as relevant in deciding whether to award a breakup fee or expense reimbursement: (1) the presence of self-dealing or manipulation in negotiating the breakup fee; (2) whether the fee harms, rather than encourages, bidding; (3) the reasonableness of the breakup fee relative to the purchase price; (4) whether the "unsuccessful bidder place[d] the estate property in a sales configuration mode to attract other bidders to the auction;" (5) the ability of the request for a breakup fee "to attract or retain a potentially successful bid, establish a bid standard or minimum for other bidders, or attract additional bidders;" (6) the correlation of the fee to a maximization of value of the debtor's estate; (7) the support of the principal secured creditors and creditors' committees of breakup fee; (8) the benefits of the safeguards to the debtor's estate; and (9) the "substantial adverse impact [of the breakup fee] on unsecured creditors, where such creditors are in opposition to the breakup fee." *Id.* at 536.

37.     The Debtors believe that putting in place a Stalking Horse Purchaser for the Assets will achieve maximum value in their proposed Sale process and, to that end, the Debtors and their advisors intend to solicit interest in the market for parties to serve as Stalking Horse Purchaser. The Debtors believe that if they identify a viable Stalking Horse Purchaser, they may need to offer that party Bid Protections. The Debtors seek authority to negotiate a Break-Up Fee of up to 3.0%, an amount that the Debtors believe is reasonable in this type of transaction and

within the range of other court-approved break-up fees.  *See, e.g., In re Filene's Basement, LLC*, Case No. 11-13511 (KJC) (Bankr. D. Del. Apr. 9, 2012) (Court approved breakup fee of 3%); *In re Magic Brands, LLC*, Case No. 10-11310 (BLS) (Bankr. D. Del. Apr. 22, 2010) (Court approved breakup fee and reimbursement expense equal to 3.5% of cash portion of purchase price); *In re Chi-Chi's, Inc.,* Case No. 03-13063 (Bankr. D. Del. Nov. 4, 2003) (fee of 5.1% permitted).  Further, payment of the Bid Protections would not diminish the Debtors' estates, as the Debtors would not incur the obligation to pay the Break-Up Fee unless a higher and better bid is accepted and such transaction closes.  Absent authorization of the Bidding Protections, the Debtors could lose a potential Stalking Horse Purchaser and thus may lose the opportunity to obtain the highest and best offer for the Assets.

38.     Ultimately, the Debtors intend to establish the factual predicates for the Bidding Protections and satisfy the standards adopted by the Third Circuit in *Reliant* and *O'Brien* at the initial hearing on the Motion.  However, if no Stalking Horse Purchaser is selected by then, either (i) subject to the parameters described herein, which the Debtors submit are reasonable and appropriate, and with the consent of the Consultation Parties or (ii) to the satisfaction of the Court if the Debtors notice the designation for a hearing.

**G.     The Assumption and Assignment of the Target Contracts in Connection with the Sale Satisfies Section 365 of the Bankruptcy Code**

49.     Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor in possession, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor."  11 U.S.C. § 365(a).  One Circuit Court has stated that "[t]he purpose behind allowing the assumption or rejection of executory contracts is to permit the trustee or debtor-in-possession to use valuable property of the estate and to 'renounce title to and abandon burdensome property.'"  *Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion*

*Pictures Corp.)*, 4 F.3d 1095, 1098 (2d Cir. 1993) (quoting 2 COLLIER ON BANKRUPTCY ¶ 365.01[1] (15th ed. 1993)).

50.    The standard applied to determine whether the assumption of a contract or an unexpired lease should be authorized is the "business judgment" standard.    *See In re AbitibiBowater Inc.*, 418 B.R. 815, 831 (Bankr. D. Del. 2009) (finding that a debtor's decision to assume or reject an executory contract will stand so long as "a reasonable business person would make a similar decision under similar circumstances."); *In re HQ Global Holdings, Inc.*, 290 B.R. 507, 511 (Bankr. D. Del. 2003) (stating a debtor's decision to reject an executory contract is governed by the business judgment standard and can only be overturned if the decision was the product of bad faith, whim, or caprice).   As described above, "[t]he business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interest of the company.'"   *Integrated Res., Inc.*, 147 B.R. at 656 (quoting *Smith v. Van Gorkom*, 488 A.2d at 872).

51.    The business judgment rule is crucial in chapter 11 cases and shields a debtor's management from judicial second-guessing.    *See id.*; *see also Comm. of Asbestos Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("[T]he Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a debtor's management decisions."). Generally, courts defer to a debtor in possession's business judgment to assume or reject an executory contract or lease.   *See Wheeling-Pittsburgh Steel Corp. v. West Penn Power Co., (In re Wheeling-Pittsburgh Steel Corp.)*, 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987) (stating that the business judgment test "requires only that the trustee [or debtor in possession] demonstrate that

[assumption or] rejection of the executory contract will benefit the estate."); *see also N.L.R.B. v. Bildisco & Bildisco*, 465 U.S. 513, 523 (1984); *Control Data Corp. v. Zelman (In re Minges)*, 602 F.2d 38, 42-43 (2d Cir. 1979); *In re Riodizio, Inc.*, 204 B.R. 417, 424-25 (Bankr. S.D.N.Y. 1997); *In re G Survivor Corp.*, 171 B.R. 755, 757 (Bankr. S.D.N.Y. 1994).

52.     Here, the Debtors have exercised their sound business judgment in determining that assumption and assignment of the Target Contracts in connection with the Sale is in the best interests of the Debtors and their estates, and, accordingly, the Court should approve the proposed assumption under section 365(a) of the Bankruptcy Code. *See, e.g., In re Philadelphia Newspapers, LLC*, 424 B.R. 178, 182-83 (Bankr. E.D. Pa. 2010) (stating that if a debtor's business judgment has been reasonably exercised, a court should approve the assumption or rejection of an executory contract or unexpired lease); *Westbury Real Estate Ventures, Inc. v. Bradlees, Inc. (In re Bradlees Stores, Inc.)*, 194 B.R. 555, 558 n.1 (Bankr. S.D.N.Y. 1996); *Summit Land Co. v. Allen (In re Summit Land Co.)*, 13 B.R. 310, 315 (Bankr. D. Utah 1981) (holding that, absent extraordinary circumstances, court approval of a debtor's decision to assume or reject an executory contract "should be granted as a matter of course").

53.     As set forth above, the Sale will yield the maximum value for the Debtors' estates.  To that end, the assumption, assignment and sale of the Target Contracts will be necessary for the Debtors to obtain the benefits of any Purchase Agreement.  In addition, under section 365(k) of the Bankruptcy Code, a debtor's assignment of a contract or lease "relieves the trustee and the estate from any liability for any breach of such contract or lease occurring after such assignment." 11 U.S.C. § 365(k).  Thus, following an assignment to the Successful Bidder of any Target Contract, the Debtors will be relieved from any liability for any subsequent breach associated therewith.

54.     Furthermore, section 365(b)(1) of the Bankruptcy Code requires that any outstanding defaults under the Target Contracts must be cured or that adequate assurance be provided that such defaults will be promptly cured.  11 U.S.C. § 365(b)(1).  The Debtors propose to file with the Court, and serve on each Counterparty to a Target Contract, an Assumption Notice that indicates the proposed Cure Amount for each such contract.   As such, each Counterparty will have the opportunity to object to the proposed assumption and assignment to the Successful Bidder and to the proposed Cure Amount, if applicable.  Moreover, the payment or reserve of the applicable Cure Amount, as provided for in the Bidding Procedures, will be a condition to the Debtors' assumption and assignment of any Target Contract.

55.     Relatedly, section 365(f)(2) of the Bankruptcy Code provides that a debtor may assign an executory contract or unexpired lease of nonresidential real property if "adequate assurance of future performance by the assignee of such contract or lease is provided." 11 U.S.C. § 365(f)(2).  The words "adequate assurance of future performance" must be given a "practical, pragmatic construction" in light of the facts and circumstances of the proposed assumption.  *See In re Fleming Cos., Inc.*, 499 F.3d 300, 307 (3d Cir. 2007) (internal citation omitted); *Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1988) (same*); see also In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (finding that adequate assurance of future performance does not mean absolute assurance that debtor will thrive and profit); *In re Bon Ton Rest. & Pastry Shop, Inc.,* 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985) ("Although no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance.").

56.     Specifically, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.  *See In*

*re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (holding that adequate assurance of future performance is given where the assignee of lease has financial resources and expressed a willingness to devote sufficient funding to the business to ensure its success, and that in the leasing context, the chief determinant of adequate assurance is whether rent will be paid).

57.    Here, the Successful Bidder will have provided adequate assurance of future performance with respect to any Target Contract.  For its bid to be deemed a Qualifying Bid, each Qualifying Bidder will be required to provide evidence supporting its ability to comply with the requirements of adequate assurance of future performance under section 365(f)(2)(B) and, if applicable, section 365(b)(3) of the Bankruptcy Code (the "**Adequate Assurance Information**"), including:  (a) the bidder's financial wherewithal and willingness to perform under any contracts that are assumed and assigned to such potential bidder; (b) the name of the proposed counterparty that will act as the assignee of any Target Contract; and (c) a contact person for the proposed assignee that the Counterparty may directly contact in connection with the adequate assurance of future performance.

58.    To the extent available, the Adequate Assurance Information may also include: (x) a corporate organization chart or similar disclosure identifying ownership and control of the proposed assignee; and (y) financial statements, tax returns, and annual reports.  Furthermore, given that the Debtors will submit evidence at the Sale Hearing that all requirements for the assumption and assignment of such contracts have been satisfied, the Court and other interested parties will have the opportunity to evaluate the ability of each Successful Bidder to provide adequate assurance of future performance.

59.    Therefore, the Debtors respectfully request that the Court (a) approve the proposed assumption and assignment of the Target Contracts, and (b) find that all anti-

assignment provisions of such contracts to be unenforceable under section 365(f) of the Bankruptcy Code.[9]

## **WAIVER OF STAY UNDER BANKRUPTCY RULE 6004(h) AND 6006(d)**

62.     Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P.  6004(h).  Furthermore, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease under § 365(f) is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 6006(d).

63.     As set forth throughout this Motion, any delay in the Debtors' ability to consummate the Sale—should the Debtors determine it is the best or only viable disposition of the Assets—would be detrimental to the Debtors, their creditors and estates, and would impair the Debtors' ability to maximize value in the Assets through an expeditious closing of the Sale.

64.     For this reason and those set forth above, the Debtors submit that ample cause exists to justify a waiver of the fourteen day stay imposed by Bankruptcy Rule 6004(h) and 6006(d), to the extent applicable.

## **NOTICE**

65.     Notice of this Motion has been provided to:  (1) the Office of the United States Trustee for the District of Delaware; (2) counsel to Wells Fargo Bank, N.A.; (3) counsel to Capital Farm Credit, FLCA; (4) counsel to Black Diamond Commercial Finance, L.L.C.; (5) all

---

[9]     Section 365(f)(1) provides that "notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease..."  11 U.S.C. § 365(f)(1).  Section 365(f)(3) further provides that "notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law that terminates or modifies, or permits a party other than the debtor to terminate or modify, such contract or lease or a right or obligation under such contract or lease on account of an assignment of such contract or lease, such contract, lease, right, or obligation may not be terminated or modified under such provision because of the assumption or assignment of such contract or lease by the trustee."  11 U.S.C. § 365(f) (3).

parties known by the Debtors to assert a lien on any of the Assets; (6) counsel to the official committee of unsecured creditors (once formed); and (7) all parties that have requested notice in these chapter 11 cases under Bankruptcy Rule 2002 (the "**Motion Notice Parties**").  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

## CONCLUSION

WHEREFORE, the Debtors request entry of the Bidding Procedures Order and the Sale Order, granting the relief requested herein and such other and further relief as is just and proper.

Dated:    June 4, 2018
          Wilmington, Delaware

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Ryan M. Bartley*
M. Blake Cleary (No. 3614)
Sean T. Greecher (No. 4484)
Jaime Luton Chapman (No. 4936)
Ryan M. Bartley (No. 4985)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

*Proposed Counsel to the Debtors and
Debtors in Possession*